MATTER OF K—

In EXCLUSION Proceedings

A-6723213

*Decision by Special Inquiry Officer January 9, 1959*
*Order of the Board November 19, 1959*
*Decision by Attorney General January 3, 1961*

**Excludability—Determination based on conviction during parole.**

Conviction occurring subsequent to arrival in United States while alien was in parole status and application for admission was pending will support exclusion order notwithstanding that ground of inadmissibility may not have been in existence at the time of alien's arrival.

EXCLUDABLE: Act of 1952—Section 212(a)(9) [8 U.S.C. 1182(a)(9)]—Convicted of crime involving moral turpitude prior to entry—Procured smuggling of diamonds.

**BEFORE THE SPECIAL INQUIRY OFFICER**
(January 9, 1959)

DISCUSSION: The applicant is a 43-year-old married male alien, allegedly a native of Germany and a citizen of that country, who last arrived in the United States at the port of New York, New York, on July 30, 1956, as a passenger on the SS. *United States*. On that date he was in possession of a nonquota immigrant visa issued on March 29, 1956, by the American Consul in Germany.

The applicant was made the subject of exclusion proceedings before this special inquiry officer and was accorded a hearing in such proceedings on January 23, 1957, at the Federal Correctional Institution at Danbury, Connecticut. By decision of this special inquiry officer dated May 3, 1957, the applicant was found to be excludable from the United States under section 212(a)(9) of the Immigration and Nationality Act as an alien who had been convicted of a crime involving moral turpitude, to wit: Violation of Title 18, U.S.C., sections 2 and 545, to wit, causing and procuring smuggling of diamonds, and the applicant was ordered excluded and deported from the United States. The facts relating to the applicant's prior immigration history, the circumstances leading up to his arrest and conviction, and other relevant matters are set forth

143

in detail in my decision of May 3, 1957, and no useful purpose would be served by repeating them at length herein.

No appeal was taken from my order of May 3, 1957.

Under date of November 20, 1957, the applicant requested that the exclusion proceedings be reopened to give him an opportunity to apply for a waiver of excludability under section 5 of the Act of September 11, 1957. By order dated December 17, 1957, the proceedings were ordered reopened, and the reopened hearing has now been concluded.

There are two principal issues presented by the facts in this case. The first of these issues concerns the question of whether an alien who applied for admission to the United States may be paroled into the country pending his criminal prosecution, his inspection as an applicant for admission being deferred, and upon his ultimate conviction for a crime involving moral turpitude, examined, referred for a hearing before a special inquiry officer, and found to be excludable as a person who has been convicted of a crime involving moral turpitude prior to admission.

As already indicated, in my order of May 3, 1957, I found that the applicant was properly excludable under these circumstances and ordered him excluded and deported. The legal basis for my conclusion has been fully set forth in my decision of May 3, 1957, and I find no reason to deviate from the position stated therein in any respect.

The second issue involved herein is as to whether the applicant is entitled to a waiver under section 5 of the Act of September 11, 1957, as he has requested.

Since the applicant is married to a naturalized citizen of the United States and has two minor children who were born in the United States, it is clear that he meets the preliminary requirements for a waiver under that provision of law. However, it must also be established to the satisfaction of the Attorney General that (a) the alien's exclusion would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, or son or daughter of such alien, and (b) the admission to the United States of such alien would not be contrary to the national welfare, safety, or security of the United States.

Section 291 of the Immigration and Nationality Act provides in part as follows: "Whenever any person makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is eligible to receive such visa or such document, or is not subject to exclusion under any provision of this Act, and, if an alien, that he is entitled to the nonimmigrant, quota immigrant, or nonquota

144

immigrant status claimed, as the case may be. If such person fails to establish to the satisfaction of the consular officer that he is eligible to receive a visa or other document required for entry, no visa or other document required for entry shall be issued to such person, nor shall such person be admitted to the United States unless he establishes to the satisfaction of the Attorney General that he is not subject to exclusion under any provisions of this Act. . . ."

The subject alien is an applicant for admission to the United States and consequently has the burden of proving that he is not excludable therefrom. He has this burden of proof generally, and with regard to his request for a waiver under section 5 of the Act of September 11, 1957, has the particular burden of proving that his admission to the United States would not be contrary to the national welfare, safety, or security of the United States.

This burden of proof he has failed to meet. The applicant is a criminal who has been convicted of a single instance of smuggling diamonds. The record indicates, however, that the specific act of smuggling for which the applicant was convicted was only one of a considerably larger series of operations. The record indicates that the applicant had, in fact, sent 13 other parcels of diamonds to the United States. It is further indicated that he was permitted to plead guilty to only one such act of smuggling in order to save the Government time and money in bringing witnesses from Germany to testify at his trial. The applicant has indicated that he has approximately $75,000 in banks in Europe. Obviously, if I am to make a rational decision that the admission to the United States of the applicant would not be contrary to the national welfare, safety, or security of the United States, I require certain additional information regarding the applicant. I would like to know, for example, for how long a period and to what extent the applicant engaged in criminal activities prior to his conviction. Was his criminal career of such an intensive and varied nature as to make it unlikely that a relatively short jail sentence would effect a reformation of his character? Were his criminal activities motivated by the economic pressures of dire necessity, or were they the result of a hardened and deeply ingrained antisocietal attitude? Is the applicant truly repentant for his criminal activities, or does he merely regret the temporary interference with his plans occasioned by his arrest and conviction? Did he operate in his criminal activities as a solitary individual or was he so callous to the welfare of those close to him that he deliberately involved his wife, his brother, and his brother's wife? Was he merely the tool of another criminal or was he, himself, the master-mind of the operations? Does the applicant have information at this time which might lead

145

to the recovery of other smuggled merchandise or to the conviction of the persons involved in such smuggling operations?

However, the applicant has persistently refused to answer questions relating to these fields of inquiry, making the claim that the answers would subject him to possible criminal prosecution. In other words, he has asserted a claim to privilege under the Fifth Amendment to the Constitution of the United States. His wife has similarly refused to testify regarding this subject matter, both on the basis of the Fifth Amendment and also on the general ground that she is unwilling to testify against her husband.

To be more specific, the respondent refused to answer as to whether he had ever shipped any diamonds to the United States, the location of some $60,000 in assets in Europe, whether 13 other parcels of diamonds had been shipped into the United States by him, whether his wife was a participant in his criminal activities, and who an individual referred to by the name of "the shoemaker" was. It may be noted that the record contains correspondence sent by the applicant to his wife, brother, and sister-in-law in which there is a reference to a person so named. The applicant also refused to testify as to whether he was engaged in the business of money exchanging while in Europe. He refused to identify an individual by the name of IGNAC, who an individual by the name of SCHLAMEK was, or who a person by the name of RACHEL was. The applicant also refused to identify a copy of a letter which has been made part of this record, although his wife had previously identified it as being in his handwriting.

The applicant's wife testified in his behalf at the hearing before me. She denied ever having assisted her husband in smuggling diamonds into the United States or, in fact, being aware of his activities until his arrest. She denied ever hearing of anyone who was referred to as "the shoemaker" or ever having received a letter in which such a reference was made. She also denied ever having paid a sum of $5,000 to a man named SAM WEISS, or any such incident in fact. However, when confronted with exhibit R-2, a letter which she admits is in her husband's handwriting, and which makes reference to "the shoemaker," as well as to the applicant's instruction to his wife to pay $5,000 to Sam Weiss, she refused to answer any further questions about the letter claiming her privilege under the Fifth Amendment. I notice also that immediately after this letter was introduced into evidence with its necessary implications that she was in fact involved in assisting her husband in his operations, and was quite well aware of his activities, she became ill and asked to be excused from further testimony.

When she again appeared in the course of these proceedings she refused to testify as to when she first found out that her husband

146

was involved in smuggling, whether she knew that her husband's brother and sister-in-law were involved in the activities, and in general to give any testimony which might incriminate herself or her husband. She also refused to answer whether her husband made any trips in Europe without her, or whether her husband carried on business from an office or from their home. She refused to answer how long a period of time was covered by her husband's activities in the smuggling of diamonds, or when these activities ceased. She testified that between 1950 and 1956 she was supported by her husband, but refused to state what kind of work he was doing. It may be noted that there exists the possibility that the applicant's wife was within her legal rights to refuse to testify as to any matter which might tend to incriminate her husband. Such a position would rest upon the so-called husband-wife privilege and would be based upon the continuing marital relationship. However, with regard to questions directed to her regarding her own participation in the smuggling operation, or her knowledge of such operations, we are directly concerned with her own credibility. Prior to taking refuge behind the Fifth Amendment, she had specified that she had not participated in such activities and did not know of them. While she has a right to assert her claim under the Fifth Amendment, since in fact her testimony would tend to incriminate her, an inference may be drawn from her failure to testify which may well reflect adversely on her credibility. The applicant and his wife were repeatedly and explicitly warned that the burden of proof of establishing the applicant's eligibility for admission rested upon the applicant, and that the special inquiry officer considered the requested testimony as relevant to the issue of whether the admission of the applicant to the United States would be contrary to the national welfare, safety or security of the United States. It cannot be claimed, therefore, that the position taken by the applicant and his wife was one which was not carefully and deliberately chosen.

Upon a consideration of all of the facts of record, I find that the applicant has failed to sustain the burden of establishing that his admission to the United States would not be contrary to the national welfare, safety or security of the United States, a prerequisite to the grant of relief under section 5 of the Act of September 11, 1957, and, accordingly, such relief will be denied.

It is noted that the courts have uniformly upheld the denial of discretionary relief for failure of an alien to answer questions relevant to such relief. See, for example, *Jimenez v. Barber*, 226 F.2d 449; 235 F.2d 922 (and decision in the same matter (252 F.2d 550) decided by the Circuit Court of Appeals for the Ninth Circuit, January 30, 1958). In the cited case, the subject had applied for

suspension of deportation but refused to answer questions regarding his membership in or affiliation with organizations prior to the five-year period for which he was required to establish good moral character. However, I feel that resort to such authority is unnecessary in the instant case. If the applicant had succeeded in establishing the basic requirement for relief under section 5 of the Act of September 11, 1957, namely, the hardship to his spouse and children and that his admission would not·be contrary to the national welfare, safety or security of the United States, such cases would be authority for a denial of the relief as a matter of administrative discretion by reason of his obstructive attitude. In view of the fact, however, that he has failed to establish the basic prerequisites, he has not even reached the question of whether the discretion of the Attorney General should be exercised in his particular case.

At the outset of these hearings counsel made a tentative objection to the fact that an examining officer had been assigned to present the Government's case in this matter. The case was originally started before me without the benefit of an examining officer. When the motion for reopening and reconsideration was made for the purpose of requesting relief under section 5 of the Act of September 11, 1957, it appeared to me that the issues involved were sufficiently complex to warrant the services of an examining officer for the purpose of preparing and presenting the facts. Accordingly, the assignment of such an officer was requested. I am satisfied that adequate authority exists for the assignment of such an officer in the recently decided case of *Matter of M—*, 8—24.

The allegations of fact and the conclusion of law contained in my decision of May 3, 1957, will be adopted as the findings of fact and conclusion of law of this decision.

**ORDER:** It is ordered that the applicant be excluded and deported from the United States.

### BEFORE THE BOARD
(November 19, 1959)

**DISCUSSION:** On April 15, 1959, we sustained the alien's appeal and directed that he be admitted as a nonquota immigrant. The Service filed a motion for reconsideration on May 29, 1959. Upon further consideration of the case in the light of that motion, we entered an order on July 31, 1959, affirming our previous order that the alien be admitted to the United States. The matter is now before us pursuant to the request of the Service on August 21, 1959, that the case be referred to the Attorney General for review pursuant to 8 CFR 3.1(h)(1)(iii).

The appellant is a 44-year-old married male, native and citizen

148

of Germany. He first arrived in the United States on July 17, 1947, and was admitted for permanent residence. He was absent on four occasions and last departed in November 1950. The appellant next arrived in the United States at the port of New York on July 30, 1956, and made application to be admitted for permanent residence. He was in possession of the required immigrant visa, having secured nonquota status on the basis of his wife's United States citizenship.

Upon arrival, the appellant was apparently examined by an immigration officer and was then placed in the Federal House of Detention in New York City to await further action by the United States Attorney. On August 2, 1956, he was detained for hearing by a special inquiry officer. He was paroled under section 212(d)(5) of the Immigration and Nationality Act [8 U.S.C. 1182(d)(5)] on August 27, 1956. On December 17, 1956, the appellant was convicted of violating 18 U.S.C. 2 and 545, in that, on August 2, 1954, with intent to defraud the United States, he procured the smuggling of diamonds worth approximately $243,810. He was sentenced to imprisonment for 15 months. The first hearing before a special inquiry officer took place on January 23, 1957.

The matter which is pending at this time is the appellant's application of July 30, 1956, for admission to the United States. If his conviction had taken place prior to the date when he applied to the American Consul for his immigrant visa, he would have been ineligible to receive a visa and he would have been inadmissible to the United States in accordance with 8 U.S.C. 1182(a)(9). However, it is not disputed by the Service that the appellant was, in fact, eligible to receive his visa and that he could not have been excluded on July 30, 1956, when he applied for admission to the United States, inasmuch as the conviction had not yet occurred. The sole issue to be determined is whether the appellant can be excluded on the basis of the conviction which occurred subsequent to his application for admission to the United States. On this issue, we believe that the decisions in *Tulsidas* v. *Insular Collector of Customs*, 262 U.S. 258, and *Matter of B—*, 7—1 (1956), are controlling and require the appellant's admission.

In *Tulsidas* v. *Insular Collector of Customs, supra,* the alien's contention was that he could acquire the status of a merchant after entry, but the Supreme Court rejected the contention and held that the status must exist at the time of the application for admission. This decision constitutes ample authority for the proposition that an alien's application for admission to the United States is to be determined on the basis of the facts existing when the application is made. The Service has not cited any judicial decision which would indicate that this is not the law.

149

In *Matter of B—*, *supra*, an alien applied for admission to the United States on August 28, 1950. His passport expired on August 3, 1951, and the exclusion hearing took place in 1954. In that case the Service argued that the alien had not yet been admitted to the United States and that he was required to present a passport valid for at least 60 days beyond the period of his authorized admission. We specifically stated, "the application for admission must be determined on the basis of the facts as they existed on August 28, 1950"—the date of the application—and our final conclusion was that, inasmuch as the alien's passport was valid at the time of his application for admission, the regulations did not preclude his admission merely because his passport thereafter expired (7 I. & N. Dec. at pp. 4 and 35). Our decision was approved by the Attorney General on June 6, 1956, although the principal question considered by him was whether this Board had power to determine factual issues.

The Service contends that admissibility must be determined on the basis of the facts existing at the time the alien "is examined for admission." On August 2, 1956, the examining immigration officer detained this appellant for a hearing before a special inquiry officer. When he was examined for admission on or about August 2, 1956, the appellant was admissible to the United States. His conviction occurred before his second 'examination for admission which took place before a special inquiry officer on January 23, 1957. Since the appellant was examined for admission on two occasions, the actual contention of the Service is that admissibility is to be determined on the basis of the facts existing at the time of the hearing before the special inquiry officer.

In its motion of August 21, 1959, the Service stated that we had said that admissibility must be determined as of the date the alien arrives. Actually, what we said was that admissibility was to be determined on the basis of the facts existing on the date the application for admission to the United States was made. This appellant arrived in the United States on July 30, 1956, and that was also the date of his application for admission. The distinction in phraseology is, nevertheless, important. Not only is it entirely logical that an application for admission to the United States should be determined on the basis of the facts existing when the application is made, but the statute itself indicates that the question of whether an alien is admissible or inadmissible is to be determined as of the date of his application for admission.

The Service has not pointed to a single statutory provision which states, or even indicates, that an alien's admissibility is to be determined on the basis of the facts existing when the alien is accorded a hearing before a special inquiry officer. As against the

150

lack of any specific statutory authority for the view of the Service, our conclusion that admissibility is to be determined on the basis of the facts existing at the time the alien applies for admission to the United States is supported by various provisions of the Immigration and Nationality Act. While we have not attempted to set forth all of the references, the following are illustrative.

8 U.S.C. 1201(h) provides: "Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to enter the United States, if, *upon arrival* at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law * * *" (emphasis supplied). In other words, even if an immigrant visa is inadvertently issued to an alien, he is not entitled to enter the United States if he is found inadmissible upon arrival at a port of entry. The statute does not say "if he is found inadmissible at the time of the exclusion hearing before the special inquiry officer" which is the position of the Service.

The significance of the "application for admission" to the United States is attested to by the fact that it is a defined phrase in 8 U.S.C. 1101(a)(4) and by its use in other sections. 8 U.S.C. 1181(a) provides: "No immigrant shall be admitted into the United States unless at the time of application for admission he (1) has a valid unexpired immigrant visa * * * and (5) is otherwise admissible under this chapter." Hence, not only the question of whether an immigrant is properly documented, but also the question of whether he is "otherwise admissible" is to be determined "at the time of application for admission."

Other specific statutory provisions in which a particular fact or condition must exist at the time of the application for admission, or prior thereto, or during a particular period prior to the application for admission, appear in 8 U.S.C. 1181(c); 8 U.S.C. 1182(a), subparagraphs (14), (15), (20), (21), (26), and the second sentence of subparagraph (28); and 8 U.S.C. 1184(b). 8 U.S.C. 1361 provides: "*Whenever* any person * * * makes application for admission, * * * the burden of proof shall be upon such person to establish that he * * * is not subject to exclusion * * *." Subparagraph (9) of 8 U.S.C. 1182(a), which is the very paragraph under which it is claimed the appellant is inadmissible, contains an exception with respect to a crime committed while under the age of 18 and more than five years "prior to date of application for admission to the United States."

The Service places its principal reliance on section 212(d)(5) of the Immigration and Nationality Act [8 U.S.C. 1182(d)(5)]. This statutory provision contains the authority for parole but has nothing to do with the determination of admissibility or inadmis-

151

sibility—a subject which is covered by subsection (a) of 8 U.S.C. 1182 and other provisions. We previously discussed this matter on pages 3 and 4 of our order of July 31, 1959. The Service emphasized that part of 8 U.S.C. 1182(d)(5) which provides that, after termination of parole, the alien's case "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." This language means only that an application for admission, which had not been finally determined at the time the alien was paroled, will be resumed, following termination of the parole, at the same point at which the proceedings had been interrupted. This is borne out by the fact that the pertinent regulation (8 CFR 212.5) provides that, upon termination of parole, the alien "shall be restored to the status which he had *at the time of parole.*" Hence, when this appellant's parole was terminated, he was restored to the *status* which he had on August 27, 1956, the date of his parole. On that date, the appellant had not been convicted of the crime and he was not excludable under any provision of the immigration law.

We turn now to the contention of the Service (motion of August 21, 1959, page 2), that the Board's position "gravely jeopardizes the parole procedures of the Service, since its net effect is to accord the alien substantial benefits and rights he would not otherwise have, in violation of *Leng May Ma* v. *Barber,*" 357 U.S. 185. It was also stated that the liberal exercise of parole "will be seriously impaired in view of the difficulties which can be encountered in effecting the alien's removal." This is also the contention numbered 3 on page 5 of the Service motion.

The Service has not stated how *Leng May Ma* v. *Barber, supra,* could possibly be relevant in the appellant's case, nor in what respect there is a conflict between them. Our decision concerning the appellant did not, of course, contravene *Leng May Ma* v. *Barber.* In that case, the court held that an excluded alien, released on parole, was not eligible for a stay of deportation under section 243(h) of the Immigration and Nationality Act [8 U.S.C. 1253(h)], and the court also affirmed its well-settled rule that an alien in custody pending determination of his admissibility or an excluded alien who was paroled has not made an "entry" into the United States. 8 U.S.C. 1253(h) is not involved in the appellant's case, and the statements which we made in our order of April 15, 1959, and in our order of July 31, 1959, show that we regard the appellant's physical presence in the United States from July 30, 1956, as not constituting an entry for immigration purposes and that he is still technically outside the portals of the United States. However, there is nothing in 8 U.S.C. 1182(d)(5) which would require that, because the appellant has not yet made an entry, the deter-

152

mination concerning his admissibility is to be made as of any date other than the date of his original application for admission to the United States.

The Service also has not amplified its statement that the difficulties which can be encountered in effecting the alien's removal will seriously impair the liberal exercise of parole under 8 U.S.C. 1182(d)(5). The case of this appellant and that of the alien in *Matter of B—*, 2—172 (1944), appear to be the only two cases in the last 15 years in which the Service has paroled an alien who was actually admissible to the United States when he applied for admission. Otherwise, the aliens who have been paroled into the United States were those who were inadmissible to the United States *at the time of their applications for admission* and, under our decision in this appellant's case, such an alien is to be excluded and deported after the termination of his parole. Hence, the decision here creates no obstacle to removal of such parolees but actually affirms the excludability of a parolee who was inadmissible at the time he applied for admission to the United States.

The Service complains that under our ruling it must proceed against the appellant in a deportation proceeding, and that "there is a very grave question as to whether he would be deportable at all" notwithstanding his conviction for a serious offense as recently as December 17, 1956. Inasmuch as a deportation proceeding has not been instituted, we decline to express any opinion at this time as to whether the appellant would be subject to deportation. However, the theory that the Service can choose whether to proceed in an exclusion proceeding or in a deportation proceeding seems to be in conflict with *Kwong Hai Chew* v. *Rogers*, 257 F.2d 606 (C.A. D.C., 1958). Of course, if the statute authorized the exclusion of the appellant, we would have dismissed his appeal when the case was first considered by us on April 15, 1959. In *Gegiow* v. *Uhl*, 239 U.S. 3, 9 (1915), it was said: "The statute by enumerating the conditions upon which the allowance to land may be denied, prohibits the denial in other cases." Since we hold that the statute does not authorize the exclusion of the appellant, there is not merit, of course, in the contention of the Service that he should be excluded because the Service might not be able to deport him.

In its two motions, the Service raised a number of extraneous issues. We considered them fully in our order of July 31, 1959, and we explained why these contentions have no relevance to the appellant's case. They need not be further discussed except that we deem it appropriate to state that there are certain inaccuracies in the motion of the Service dated August 21, 1959. For example, the Committee Report on the bill which became Public Law 85–559 and Congressman Feighan's remarks do not indicate that *section 2*

of the bill restates the original Congressional intent. Another matter is that, while there are provisions for excluding aliens because of mental or physical defects or disabilities if they fall within the classes enumerated in subparagraphs (1) through (7) of 8 U.S.C. 1182(a), the question of whether or not a disability is curable has no bearing on whether the alien is or is not admissible.

The Service has not been able to sustain its position by any specific language in the Immigration and Nationality Act nor by the citation of any judicial decision. In view of the repeated statutory references to the "application for admission" mentioned above, particularly the provisions of 8 U.S.C. 1181(a)(5), *supra*, and on the authority of the two decisions previously mentioned which we consider controlling, we hold that the question of whether this appellant is admissible or inadmissible must be determined on the basis of the facts as they existed on July 30, 1956, the date of his application for admission to the United States. Accordingly, we adhere to our previous conclusion that this appellant is admissible to the United States.

**ORDER:** It is ordered that our order of July 31, 1959, be and the same is hereby affirmed.

*It is further ordered* that this case be referred to the Attorney General for review under 8 CFR 3.1(h)(1)(iii) in accordance with the request of the Service.

### BEFORE THE ATTORNEY GENERAL
### (January 3, 1961)

**ORDER:** The decision of April 15, 1959, by the Board of Immigration Appeals in this case, as modified on July 31, 1959, which sustained the alien's appeal and directed his admission as a nonquota immigrant as of July 30, 1956, is disapproved. The order of the special inquiry officer excluding the alien by reason of his conviction of a crime involving moral turpitude is reinstated.

---

This case is before me in accordance with the provisions of 8 CFR 3.1(h)(1)(iii), for review of a decision by the Board of Immigration Appeals.

The alien concerned was admitted for permanent residence in 1947. Following his initial entry he made a number of trips abroad, returning the last time on July 30, 1956, in immigrant status, having secured nonquota documents on the basis of the United States citizenship of his wife who remained here during his absence.

As a result of investigations conducted prior to his arrival date by Customs and Immigration authorities, information was on file which implicated him in large-scale diamond smuggling activities.

His co-conspirators, a brother and sister-in-law, had been arrested before his arrival for participation in these smuggling activities. He knew of their arrests and was also aware when he arrived that charges were pending against him in New York. The Service thus had good reason to believe that he was of a criminal class ineligible for admission and, therefore, did not admit him upon presentation of his documents. Instead he was turned over to Customs authorities, who arrested him on smuggling charges. After arraignment before a United States Commissioner, he was returned to the custody of the Immigration and Naturalization Service and thereupon was released on parole by the Service, in accordance with procedures authorized in section 212(d)(5) of the Immigration and Nationality Act, "pending completion of primary inspection."

Subsequently, he pleaded guilty to the court of smuggling charges, and, on December 17, 1956, the court imposed a 15-month sentence. He served his sentence at the Federal Correctional Institution in Danbury, Connecticut, where he was accorded a hearing on his immigration status on January 23, 1957. The special inquiry officer who heard his case found him excludable under section 212(a)(9) of the Immigration and Nationality Act, as an alien convicted of a crime involving moral turpitude, to wit, causing and procuring the smuggling of diamonds. Although the special inquiry officer found the alien inadmissible because of his conviction, the order of exclusion included perforce the alien's admission of the commission of a crime involving moral turpitude in view of his plea of guilty before the court on October 29, 1956. Aliens who admit the commission of crimes involving moral turpitude are excludable under the statute equally with aliens who have been convicted of such offenses. A plea of guilty in a criminal prosecution has long been regarded as an "admission" within the meaning of the immigration laws. *Blumen* v. *Haff*, 78 F.2d 833 (C.C.A. 9, 1935), cert. den. 296 U.S. 644.

The service upheld the decision of the special inquiry officer, but on appeal the Board reversed that decision and directed the alien's admission, finding that the criminal conviction as a result of a plea of guilty while he was on parole, even though it involved a crime committed prior to parole, did not affect his eligibility for admission. In the Board's view, eligibility of an alien must be determined as of the time of application for admission. In that view a criminal conviction as a result of an admission of guilt, even if based on a crime committed prior to the application, is not a part of the exclusion proceedings at all.

The Service points out that the alien, when he applied for admission on July 30, 1956, had already caused and procured the smuggling of diamonds. The Service argues further that since the

155

alien was already known to the Immigration and Customs authorities to have been engaged in jewel smuggling, there was, on July 30, 1956, substantial doubt about his eligibility for admission. Thus, the issue to be resolved arises out of the Board's position and the Service's reliance upon admission of guilt in court which occurred after he was placed on parole, as justification for excluding him.

I am disapproving the decision of the Board of Immigration Appeals and approving the Service's action ordering the alien's exclusion because (1) the procedure followed by the Service gave the alien the fullest and fairest possible opportunity to establish his eligibility; (2) the latter seems to me to present the most reasonable interpretation of the wider Congressional intent in enacting the exclusion laws; and (3) the latter will permit continuation of the long-standing administrative practice of utilizing parole in certain hardship cases.

First, it cannot be argued that the alien in this case was placed on parole in the expectation that his conduct while on parole would provide a basis for excluding him. On the contrary, his criminal acts had been accomplished and it was in the belief that he was of a criminal class and therefore ineligible for admission that the Service placed him on parole. One of two possible methods was thus selected for determining his ultimate eligibility. A course of action, other than parole, would have been the holding of an administrative hearing based on information possessed by the Immigration and Customs authorities. Such a hearing could have been held immediately following his initial application. If that hearing had been held the alien's ineligibility might have been established, assuming that an admission of crime or of the elements thereof could have been elicited. Or possibly the alien, because of his testimony, might have been subjected to a perjury charge (also warranting exclusion if conviction ensued), or he might have attempted to assert a claim of privilege under the Fifth Amendment.

Notwithstanding these possibilities, the Service in the exercise of its judgment elected to follow the first course of action and released the alien on parole. His judicial trial ensued. To the extent that he was not tried in an administrative hearing nor called upon to make an admission against interest prior to trial in the courts, the alien was favored by this course of action. The Service withheld its sanctions and he was given the benefit of his day in court in full judicial proceedings. If he had been acquitted in the criminal case, he, of course, would have been admitted. Thus, I believe that the procedure followed by the Service gave the alien the fullest and fairest possible opportunity to establish his eligibility.

Second, the narrow question of whether Congress intends that an alien's qualification for coming into the United States shall be

determined at the time he first makes application for admission, when he may appear to be qualified so far as his documents alone are concerned, or whether this determination may be made after he has been paroled and accorded a hearing as a result of which he can be denied an entry because of defects based on facts occurring in large part before parole and not revealed by his documents, is one on which we find little direct help, either in the legislative history of the statutes or in the cases which have been decided in the courts. It is abundantly clear, however, that Congress intended to deny admission to aliens whose conduct brings them within the criminal classes. Additionally, the legislative history of the parole provisions of section 212(d)(5) of the Immigration and Nationality Act reveals that they were enacted in compliance with a recommendation by the Attorney General that he be given the necessary authority to parole aliens for purposes which are in the public interest. Among the latter was "purposes of prosecution" (Senate Report No. 1137, 82d Cong., 2d Sess., pp. 12–13)—the very purpose for which parole was here used.

Furthermore, to conclude, as decided by the Board, that the alien's status cannot be questioned except to disqualify him on the date of his application for admission is to reduce in large measure the usefulness of parole. By its very terms section 212 (d)(5) requires that the termination of parole be followed by the alien's return to custody, "to be dealt with in the same manner as * * * any other applicant for admission to the United States," and exclusion proceedings alone are appropriate following termination of parole (*Leng May Ma* v. *Barber*, 357 U.S. 185).

Since Congress meant for parole to be used for purposes of prosecution, and since after parole the alien is to be dealt with only in exclusion proceedings and "as any other applicant for admission," it is my view that the criminal conviction growing out of prosecution during parole for acts committed prior to parole, is full justification for excluding the alien upon conclusion of his parole. I do not believe Congress intended that a plea of guilty made during a trial be ignored when following parole the applicant is thereafter heard in exclusion proceedings.

A third aspect influencing my decision is continuation of the long-standing administrative practice of utilizing parole in certain hardship cases. The Commissioner has pointed out that the majority of persons paroled into the United States under section 212(d)(5) are inadmissible at the time of arrival and of these most are inadmissible because of curable physical disability. These are permitted in hardship cases, such as when they are joining relatives who are residents here, to enter in a parole status and if a cure is effected in this country and the disability removed, they are

157

admitted. Under the Board's ruling it would no longer be possible to adjust hardship cases in this manner because the aliens in these hardship cases would be excludable at the time they arrived. I am convinced that it is important to preserve the humane practice of permitting adjustment in worthy cases.

In reinstating the decision of the special inquiry officer in this case, I conclude that the procedure followed by the Service was eminently fair and just in that it afforded the alien full opportunity to prove his eligibility for admission.