Ramon **RAMIREZ–ALEJANDRE,** Petitioner,

v.

John **ASHCROFT,** Attorney General, Respondent.

No. 00–70724.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 7, 2001.

Filed Jan. 9, 2002.

Reheard En Banc Argued and Submitted June 20, 2002.

Filed Feb. 13, 2003.

Amended Feb. 14, 2003.

Jonathan M. Kaufman, Kaufman Law Office, San Francisco, CA, for the petitioner.

Michael T. Dougherty (briefed) and David Kline (argued), United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

Before: SCHROEDER, Chief Judge, O'SCANNLAIN, TROTT, TASHIMA, THOMAS, W. FLETCHER, GOULD, PAEZ, BERZON, TALLMAN and RAWLINSON, Circuit Judges.

Opinion by Judge THOMAS; Dissent by Judge TROTT.

## ORDER

The dissent to the opinion filed February 13, 2003, is hereby amended to replace the line TROTT, Circuit Judge, dissenting, to TROTT, Circuit Judge, dissenting, with whom O'SCANNLAIN, GOULD, TALLMAN, and RAWLINSON, Circuit Judges, join.

## OPINION

THOMAS, Circuit Judge:

In the book *Bang the Drum Slowly*, members of the fictional New York Mammoths amused themselves by drawing in dupes with a card scam known as "Tegwar," which was an acronym for "The Exciting Game Without Any Rules." Mark Harris, BANG THE DRUM S LOWLY 8 (Alfred A. Knoff, Inc.1956). The mark, lured into the game by the players' enthusiasm, would be given a handful of cards and encouraged to make wild bids using a weird vocabulary of calls that changed from round to round. *Id.* at 48, 60–64. The poor cluck would always lose but would be reassured of the game's legitimacy by the veneer of rationality that appeared to overlie the seemingly sophisticated game.

For years, the Board of Immigration Appeals ("BIA") played a variant of Tegwar in its procedural treatment of appeals from suspension of deportation decisions issued by immigration judges ("IJs"). Until recently, aliens who could demonstrate extreme hardship were eligible for suspension of deportation. Under the unique directives applicable to this remedy, the BIA was required to decide eligibility for suspension based, not on the facts that existed as of the time of the hearing before the IJ, but on the facts as they existed when the BIA issued its decision.

The BIA's factual determination was impeded by the extraordinary length of time between the IJ and BIA decisions, a period that sometimes lasted as long as a decade. In this case, it took the BIA eight years to decide the appeal. Naturally, life goes on while the wheels of justice turn, and inevitably developments occur that are relevant to the determination of whether an alien would suffer extreme hardship. Despite being charged with finding the facts as they existed at the time of its decision, the BIA did not establish any formal or consistent procedures during the period relevant to this case for the submission of evidence that became available after the IJ hearing.

The informal custom and practice of the BIA varied wildly, with the BIA in some cases declaring itself the ultimate factfinder and accepting tendered evidence in various forms, and in other cases, such as

this one, categorically rejecting evidence on the ground that it was a purely appellate body. The net result was a process without rules, with an administrative body that morphed without any consistency from fact-finding to pure appellate review of a fixed record.

The remedy of suspension of deportation now has been replaced by statute, and the function of the BIA has now been changed by regulation. This case presents the question of whether the now-repealed procedures to which petitioner was subjected violated his right to due process of law. Under the circumstances presented by this case, we conclude that they did and grant the petition for review.

## I

Because we are concerned in this case about how things were, not how they are, some historical context is important. Until 1940, immigration law did not provide any exceptions to a deportation order. "[T]he deportation statute unyieldingly demanded that an alien illegally in the United States be deported; no deviations were mentioned in the law." GORDON, MAILMAN & YALE-LOEHR, IMMIGRATION LAW and PROCEDURE § 74.01[1], 74–4.1 (Rev. ed.2002) (hereinafter referenced as "Gordon, Mailman" unless the citation is to other editions of the treatise). The sole mechanism at that time for a deportable alien to remain in the United States was a private bill passed by Congress pursuant to Art. I, § 7, of the Constitution. *INS v. Chadha*, 462 U.S. 919, 933, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Confronted with a large number of compassionate cases presented by aliens who had "established deep roots in our soil," Congress passed the Alien Registration Act of 1940, which granted the Attorney General the authority to suspend deportation in certain cases, subject to a Congressional override. Gordon, Mailman § 74.07[2][a], 74–68. The statute was

amended in 1948 "to broaden the categories of aliens eligible for suspension of deportation." *Chadha*, 462 U.S. at 933, 103 S.Ct. 2764. The 1948 amendments also repealed the Congressional override provisions and restricted the Attorney General from canceling a deportation unless both houses of Congress voted to approve the action. *Chadha*, 462 U.S. at 933, 103 S.Ct. 2764.

The Immigration and Naturalization Act of 1952 permitted one house of Congress to veto the Attorney General's suspension of deportation. *Id.* at 934, 103 S.Ct. 2764. This procedure was stricken as an unconstitutional violation of the separation of powers, first by our Court, *Chadha v. INS*, 634 F.2d 408 (9th Cir.1980), and then by the Supreme Court, *Chadha*, 462 U.S. at 959, 103 S.Ct. 2764. Thereafter, the power to suspend deportation was vested solely in the Attorney General, and suspension of deportation became an exclusively administrative process. Gordon, Mailman § 74.07[2][e], 74–71. The Attorney General delegated the authority to suspend deportation to both the BIA and to IJs. Under the procedure applicable during the relevant period, "the final approval of a suspension application by an immigration judge or the Board of Immigration Appeals[would] result in the prompt grant of lawful permanent residence." *Id.* at § 74.07[7](c), 74–129.

To receive a suspension of deportation, an alien was required to make a formal application. The administrative determination for suspension of deportation involved two steps: (1) a determination of whether the statutory conditions had been satisfied, which generally involved a question of law, and (2) a determination of whether ultimate relief would be granted to those eligible, which involved the exercise of discretion. *Id.*

As to the former, Congress always has provided specific statutory prerequisites for eligibility for suspension of deportation. During the time period applicable to this case, an alien would be eligible for suspension if (1) the applicant had been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of the application for suspension of deportation; (2) the applicant was a person of good moral character; and (3) deportation would result in extreme hardship to the alien or to an immediate family member who was a United States citizen or a lawful permanent resident. 8 U.S.C. § 1254(a)(1) (repealed).

An application for suspension of deportation first would be considered by an IJ, who would decide whether to grant relief. The rules of evidence are not applicable to immigration hearings. *Saidane v. INS*, 129 F.3d 1063, 1065 (9th Cir.1997) (citing *Baliza v. INS*, 709 F.2d 1231, 1233 (9th Cir.1983)). Thus, for example, hearsay testimony may be considered. *Olabanji v. INS*, 973 F.2d 1232, 1234 (9th Cir.1992). However, the proceeding must be conducted "in accord with due process standards of fundamental fairness." *Id.*

Under procedures applicable during the relevant period, if the IJ found statutory eligibility and elected to grant relief, the case would then be referred to the INS district office, who would decide whether to appeal the IJ's decision to the BIA. If the IJ denied the application, the alien had the right to appeal the denial to the BIA. Gordon, Mailman § 74.07[7][c], 74–130.

Under procedures applicable at the time, the BIA was required to reach its decision as to whether to grant the application for suspension of deportation based on the facts existing *at the time it decided the appeal* from the order issued by the IJ. *Chookhae v. INS*, 756 F.2d 1350, 1352 (9th Cir.1984). This factual examination was required because, as we have noted, both the BIA and the IJ had been delegated the authority to grant suspension of deportation. Thus, as we noted in *Santana–Figueroa v. INS*, 644 F.2d 1354, 1357 (9th Cir.1981), the BIA's "discretion can be properly exercised only if the circumstances are actually considered." We consistently have adhered to this view. *See, e.g., Gonzales–Batoon v. INS*, 767 F.2d 1302, 1303 (9th Cir.1985) (reversing and remanding BIA denial of suspension for its failure to evaluate applicant's medical condition after the Ninth Circuit expressly had instructed BIA to consider such factor when making its decision); *Figueroa–Rincon v. INS*, 758 F.2d 1345, 1345, *superseded by* 770 F.2d 766, 767–68 (9th Cir.1985) (reversing and remanding for BIA's failure to follow the court's instructions to consider the "emotional and psychological hardship complicated by age" because the BIA failed to consider the present circumstances in the applicant's life).

Our Circuit is not alone. For over twenty years, federal courts have directed the BIA to consider newly emerged facts before adjudicating a suspension application. For example, in *Opoka v. INS*, 94 F.3d 392 (7th Cir.1996), the Seventh Circuit vacated a BIA denial of suspension and remanded it with instructions for the BIA to consider the newly conferred legal status on the applicant's wife and children when evaluating the applicant's suspension claim. The wife's status was legalized after the original suspension application and the Seventh Circuit reasoned that if the husband's application were considered "without recognizing the status of his wife [the decision] would be futile and wasteful of scarce judicial resources." *Id.* at 395. The Seventh Circuit continued by stating that "[r]ather than improvidently attempting to review a record that has been significantly impacted by an agency decision," the decision should be remanded for the BIA to consider all

factors in the case. *Id. See also Rodriguez–Gutierrez v. INS,* 59 F.3d 504, 509–10 (3d Cir.1995) (reversing BIA denial of suspension because it had failed to consider applicant's exemplary behavior in the years subsequent to his criminal conviction); *Cortes–Castillo v. INS,* 997 F.2d 1199, 1203 (7th Cir.1993) (where BIA is given information unavailable to the IJ, it should reexamine the equities and reevaluate the case) (internal citation omitted); *Luna v. INS,* 709 F.2d 126, 128–29 (1st Cir.1983) (Breyer, J.) (reversing and remanding BIA decision in order to provide applicant a hearing to present evidence to the BIA with respect to what happened in the applicant's life in the four years since the IJ issued its decision); *Ravancho v. INS,* 658 F.2d 169, 176 (5th Cir.1981) (remanding matter for consideration of evidence not considered by BIA, specifically noting that its review of the BIA "extends at least to a determination as to whether the *procedure* followed by the Board in a particular case constitutes an improper exercise of [the Attorney General's] discretion") (emphasis added).

Our decision in *Chookhae* is illustrative. We previously had remanded the petition for review because the BIA had failed to consider the relevant factors in determining economic hardship. The BIA reviewed the record and issued a new decision without allowing the submission of any further evidence. We reversed and remanded with instructions that the BIA "consider the *current* hardship to the citizen children of the petitioner that would result from her deportation." 756 F.2d at 1352 (emphasis supplied). In *Chookhae,* we emphasized that "the appropriate exercise of the Attorney General's discretion to suspend deportation is predicated on a properly focused inquiry into the hardships claimed by the petitioner." *Id.* We instructed the BIA to conduct an examination based on "a scope that is of more than historical interest to Mrs. Chookhae, her children,

the INS and this court regarding the current, respective hardship that the imminent deportation of Mrs. Chookhae would cause." *Id.* We recently reaffirmed this principle in *Guadalupe–Cruz v. INS,* 240 F.3d 1209, 1212 (9th Cir.2001) (citing *Chookhae* and remanding suspension application to BIA with instructions to consider the current facts and petitioners' current circumstances).

Indeed, not only did appellate courts require the BIA to consider new evidence, appellate courts at the time invoked their discretionary authority to admit new evidence into the record pursuant to 28 U.S.C. § 2347(c) and 8 U.S.C. § 1105a(a)(4) (repealed 1996) and then remand the entire record for consideration by the BIA. *See, e.g., Saiyid v. INS,* 132 F.3d 1380, 1384–85 (11th Cir.1998) (considering whether remand for the consideration of new evidence with respect to suspension application admitted for the first time on appeal was warranted under § 2347) (superceded by statute on other grounds); *Makonnen v. INS,* 44 F.3d 1378, 1384–86 (8th Cir.1995) (asylum); *Bernal–Garcia v. INS,* 852 F.2d 144, 147 (5th Cir.1988) (asylum); *Becerra–Jimenez v. INS,* 829 F.2d 996, 1000–02 (10th Cir. 1987) (voluntary departure); *Dolores v. INS,* 772 F.2d 223, 226–27 (6th Cir.1985) (per curiam) (motion to reopen with respect to asylum); *Coriolan v. INS,* 559 F.2d 993, 1002–04 (5th Cir.1977) (reversing denial and remanding matter under § 2347(c) for further consideration of the alien's asylum claim after taking judicial notice of a human rights report that was outside of the record, which contended current persecution existed in the country at issue).

The direction to consider current evidence was not an invention of appellate courts. Rather, it was fully consistent with the BIA's own practice of determin-

ing admissibility "on the basis of the law and the facts existing at the time the application is finally considered." *Matter of Kazemi*, 19 I. & N. Dec. 49, 51, 1984 WL 48583 (BIA 1984); *see also Matter of Alarcon*, 20 I. & N. Dec. 557, 562, 1992 WL 249104 (BIA 1992) (citing *Kazemi*); *Matter of Correa*, 19 I. & N. Dec. 130, 133–35, 1984 WL 48595 (BIA 1984); *Matter of Morgan*, 13 I. & N. Dec. 283, 284, 1969 WL 16964 (BIA 1969) ("[T]he facts as they now exist are determinative . . . ."); *Matter of K—*, 9 I. & N. Dec. 143, 1959 WL 11617 (BIA 1959, A.G.1961), *aff'd sub nom.; Klapholz v. Esperdy*, 201 F.Supp. 294, 298–99 (S.D.N.Y.1961), *aff'd*, 302 F.2d 928, 929 (2d Cir.1962) (per curiam); *see also Ali v. Reno*, 22 F.3d 442, 448 n. 3 (2d Cir.1994) (citing *Kazemi*).

The BIA's consideration of current evidence in making its decisions in suspension of deportation cases was completely consistent with its delegated responsibility. Unlike a normal adjudicated case proceeding under the Administrative Procedure Act, 5 U.S.C. § 554, *et seq.*, the BIA never was acting as a traditional appellate administrative body. It was vested with the authority to exercise the discretion granted by the Attorney General consistent with the statutory requirements. Thus, in making the determination whether an applicant was presently of good moral character and would suffer extreme hardship, the BIA necessarily had to consider the facts as they existed at the time of the BIA decision. If, for example, the applicant had gone on a murderous killing spree between the time of the IJ and BIA decisions, that fact certainly would be relevant to determining present "good moral character." Similarly, new facts relevant to the determination of extreme hardship that developed after the IJ decision were necessarily material to the BIA's independent determination as to an alien's statutory eligibility for suspension and whether

the Attorney General's discretion should be exercised.

The practice of considering current evidence on appeal also was consistent with the BIA's general powers during the relevant period. At that time, the BIA retained enormous discretionary power. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Kashefi–Zihagh v. INS*, 791 F.2d 708, 711 (9th Cir.1986) (noting the BIA's power to re-find the facts and to accept new evidence on appeal). As the BIA itself has described it, "the Board has had broad authority to engage in a de novo review of the record underlying an Immigration Judge's decision and make its own independent findings of fact, irrespective of those made by the Immigration Judge." *In re S–H–*, 23 I. & N. Dec. 462, 463–64, 2002 WL 31173153 (BIA 2002). The BIA itself exercises its broad discretion to make its own independent findings of fact in suspension cases. *See, e.g., Charlesworth v. INS*, 966 F.2d 1323, 1325 (9th Cir.1992) ("The Board is not required to defer to the immigration judge's findings and conclusions. [Applicant's] argument that the Board failed to do so miscomprehends the Board's role in immigration proceedings: the [Board] has the power to conduct a de novo review of the record, to make its own findings, and independently to determine the legal sufficiency of the evidence.") (internal citations and quotation marks omitted); *Cordoba–Chaves v. INS*, 946 F.2d 1244, 1249 (7th Cir.1991) (observing that "[t]he BIA reviewed the entire administrative record de novo" and affirming its authority to do so); *Castillo–Rodriguez v. INS*, 929 F.2d 181, 185 (5th Cir.1991) (observing that "the Board explicitly disclaimed any reliance on the immigration judge's credibility findings"); *Damaize–Job v. INS*, 787 F.2d 1332, 1338 (9th Cir.1986) ("The Board has the power to review the record de novo and make its

own findings of fact, including credibility determinations."); *Noverola–Bolaina v. INS*, 395 F.2d 131, 135 (9th Cir.1968) (finding that "[i]t is the common practice of the Board to make its own independent findings of fact"); *Matter of Edwards*, 20 I. & N. Dec. 191, 196, 1990 WL 385757 (BIA 1990) (stating that "we have reviewed the record on a de novo basis" and then explaining which parts of the record it weighed and which parts it ignored in making its decision. Its offered explanation for ignoring some evidence in the record was "for purposes of expediency."); *Matter of B—*, 7 I. & N. Dec. 1, 36, 1955 WL 8689 (A.G.1956) (decision by Attorney General finding that the BIA had power to make independent findings of fact that are contrary to those of an inquiry officer); GORDON & ROSENFIELD, IMMIGRATION LAW AND PROCEDURE § 1.10(e), 1–58 (Rev. ed.1967) (excerpting statement by the BIA Chair describing its function as "[u]nlike appellate courts" and noting that the BIA conducted *de novo* review, not review of the findings for substantial supporting evidence).

Although charged with the responsibility of considering newly developed evidence in making determinations on suspension of deportation, the BIA failed to adopt procedures necessary to implement that responsibility during the relevant period. Surprising as it may seem, there were no applicable regulations at the time that permitted an applicant to move to supplement the record while the appeal was pending. Instead, the BIA elected to proceed with an ad hoc, case-by-case approach.

This problem is not one of recent discovery. Almost ten years ago, we described the BIA's procedures as "schizophrenic." *Yepes–Prado v. INS*, 10 F.3d 1363, 1372 (9th Cir.1993). Indeed, during the relevant period, the BIA failed even to define consistently the standard of review under which it was considering the IJ's decision

on suspension applications. Judge Posner termed the practice "irresponsible" and the government's argument supporting the procedure as "incoherent[ ]" and "astonishing[ ]." *Ortiz–Salas v. INS*, 992 F.2d 105, 107 (7th Cir.1993). *See also, Hazzard v. INS*, 951 F.2d 435, 440 n. 4 (1st Cir.1991) (observing that although "[t]he BIA has the discretionary power to conduct *de novo* review of an immigration judge's decision," it "does not invariably do so"). In response to the criticism set forth in *Yepes–Prado* and *Ortiz–Salas* with respect to its lack of consistent review standards, the BIA clarified that "when the Board engages in a review of a discretionary determination by an immigration judge, we rely upon our own independent judgment in deciding the ultimate disposition of the case." *Matter of Burbano*, 20 I. & N. Dec. 872, 873, 1994 WL 520994 (BIA 1994). The issue presented on this case does not address the adequacy of the BIA's standard of review. Rather, the inquiry focuses on whether, within its exercise of such "independent judgment," the BIA considered new evidence offered on appeal.

On occasion, the BIA itself has accepted new evidence presented on appeal. *See, e.g., Charlesworth*, 966 F.2d at 1325 (observing that BIA affirmed IJ decision after considering a letter that the INS submitted with its appellate brief); *Hazzard*, 951 F.2d at 437 (observing that BIA affirmed IJ decision after considering evidence that the applicant had requested be submitted with its appellate brief); *Matter of Godfrey*, 13 I. & N. Dec. 790, 791, 1971 WL 24426 (BIA 1971) ("[W]e ordinarily confine our review to a consideration of the record alone, although in exceptional cases we do receive and consider additional affidavits or other documents not previously available."); *Matter of Ss. Captain Demosthenes*, 13 I. & N. Dec. 345, 346 n. 1, 1969 WL 16979 (BIA 1969) (accepting evidence submitted after the IJ decision).

The BIA also, on occasion, remanded the proceeding or reopened the matter for consideration of new evidence by an IJ. *See, e.g., Matter of Li,* 21 I. & N. Dec. 13, 18–19, 1995 WL 239563 (BIA 1995) (remanding proceedings after evaluating new evidence that was submitted on appeal. "Ordinarily, we would not consider evidence first offered on appeal. However, in this instance the issue to which this evidence pertains was understandably not focused on below ...."); *Matter of Pena–Diaz,* 20 I. & N. Dec. 841, 845–46, 1994 WL 442053 (BIA 1994) (granting motion to reopen and remanding for consideration of extreme hardship in light of the equities accrued by respondent during the years INS "has affirmatively permitted the alien to remain" by failing to enforce final deportation order); *Matter of Flores–Gonzalez,* 11 I. & N. Dec. 485, 488, 1966 WL 14281 (BIA 1966) (remanding for consideration of whether respondent established good moral character from "the date of the filing of his application for suspension of deportation up to and including the final adjudication of the said application").

Some of the BIA's remands to IJs were *sua sponte;* some were pursuant to motions. As the BIA itself acknowledged, the regulations did not provide a mechanism for a party to request a remand. The remands were granted informally "as a matter of motions practice." *See Matter of Coelho,* 20 I. & N. Dec. 464, 470, 1992 WL 195806 (BIA 1992) ("Motions to remand are not expressly addressed by the Act or the regulations. However, such motions are commonly addressed to the Board.").

On other occasions, as in the instant case, the BIA has refused to admit further evidence relevant to suspension relief into the record, stating that it is categorically precluded from doing so. *See, e.g., Matter of S–A–,* Int. Dec. # 3433 at 2, 2000 WL 827754 (BIA 2000) (accepting late brief but not supplemental evidence by citing to *Fedorenko's* proposition that the BIA is an appellate body); *Matter of Fedorenko,* 19 I. & N. Dec. 57, 74, 1984 WL 48585 (BIA 1984) (rejecting counsel's request made at the time of oral argument to submit a letter in the record describing itself as "an appellate body whose function is to review, and not to create, a record").

In short, despite its responsibility to consider current relevant evidence in suspension cases, the BIA decided if and when it would accept evidence on a haphazard, irregular basis, without any written regulation or procedure, and with the rules changing from case to case. To be blunt, counsel for applicants were the marks in a game of Tegwar.

For many years, the lack of rules and procedures did not have adverse consequences. The BIA was, for the most part, current in its work. It heard appeals promptly and dealt with records that were still warm. However, as delays between the IJ and BIA hearings began to lengthen, the problem became more acute. In *Chookhae,* there had been a gap of five years between the IJ and BIA decisions, which we deemed too lengthy for the BIA to rest on the record that existed at the IJ hearing. 756 F.2d at 1352. By the time of our decision in *Chookhae,* such delay was not atypical. Last year, the Attorney General gave a press conference at which he called the BIA's delays "shocking" and "unacceptable," noting that the BIA has "a massive backlog of more than 56,000 pending cases" of which over 10,000 "are over three years old" and "[e]ven worse, there are some ... that are more than seven years old." Attorney General John Ashcroft, Speech Announcing Administrative Change to Board of Immigration Appeals (Feb. 6, 2002) (transcript *available at* http://www.usdoj.gov/ag/speeches/

2002/020602transcriptadministrativechangetobia.htm) (hereinafter "Attorney General Speech"); *see also* Board of Immigration Appeals: Procedural Reforms To Improve Case Management, 67 Fed.Reg. 7309, 7310 (Feb. 19, 2002) (hereinafter "Procedural Reforms") ("Numerous cases have languished before .the Board. for more than two years, some for more than five years ...."). In the instant matter, the IJ issued a decision in March 1992, and the BIA did not rule on the appeal until June 2000, just over eight years later.

Over a period of eight years, much can change in an immigrant family's life, particularly in the factors relevant to a determination of extreme hardship, such as health, employment, and community ties. There may also have been changes in the facts relevant to the determination of good moral character—positive and negative. However, during the relevant period, the BIA had no formal procedure for the government or an applicant to tender new relevant evidence while an appeal was pending.

Although the BIA failed to establish any mechanism for the applicant and the government to tender post-hearing relevant evidence, it did have one procedure at the time for the consideration of new evidence: a post-BIA decision on a motion to reopen. During the period relevant to this case, there were two operative regulations, 8 C.F.R. §§ 3.2 and 3.8 (1992). Section 3.2 granted the BIA the power "on its own motion[to] reopen or reconsider any case in which it has rendered a decision" but limited such authority by providing that no motion "shall be granted" unless the alien establishes particular evidentiary and procedural conditions. Section 3.8 enumerated the filing procedures and other administrative matters relating to motions to reopen or reconsider.

Motions under § 3.2 to reopen a BIA decision were subject to highly restrictive rules. First, the applicant was required to have established prima facie eligibility for suspension of deportation *before* a motion to reopen would be granted. *INS v. Wang,* 450 U.S. 139, 141, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1980); *In re Gutierrez–Lopez,* 21 I. & N. Dec. 479, 482, 1996 WL 413581 (BIA 1996). In other words, a motion to reopen could not be used to tender evidence to establish prima facie eligibility.

Second, § 3.2 provided for reopening a case in which the BIA "ha[d] rendered a decision." A motion to reopen is proper after a decision has been made, not before. By its own terms, the regulation failed to provide a procedure for an alien to supplement the administrative record before the BIA rendered its final decision, even though facts might have existed at the time of decision that were legally sufficient to establish the alien's eligibility for relief.

Third, neither § 3.2 nor § 3.8 provided for a procedure by which a party or the government could petition for remand. As particularly relevant to the instant case, the regulations failed to contemplate any circumstances in which a party who had prevailed before the IJ could seek a motion granting further consideration of its case.

Fourth, at the relevant time, regulations governing relief granted through a motion to reopen had become exceptionally restrictive. For relief to be granted, a motion had to be filed within a limited time period, and only one motion could be filed throughout the duration of the case regardless of what the circumstances demanded.

Finally, as a general matter, the BIA disfavored motions for reopening of immigration proceedings. The BIA considered a motion to reopen post-hearing not a mat-

ter of right, but rather, an "extraordinary remedy" that is used "sparingly" and "reserved for truly exceptional situations." *See, e.g., In re G–D–*, 22 I. & N. Dec. 1132, 1999 WL 1072237 (BIA 1999); *In re J–J–*, 21 I. & N. Dec. 976, 984, 1997 WL 434418 (BIA 1997) (reserving motions to reopen for "exceptional situations"); *In re Arie Shaar*, 21 I. & N. Dec. 541, 546, 1996 WL 426889 (BIA 1996) (finding no "compelling circumstance" warranting a motion to reopen); *Matter of Pena–Diaz*, 20 I. & N. Dec. 841, 844, 1994 WL 442053 (BIA 1994) (observing that alien requesting such action bears a "heavy burden"). Obviously, when long delays on appeal had become common, the need to provide additional character or hardship evidence was routine, rather than "exceptional."

These significant restrictions placed on motions to reopen were well within the authority of the BIA to create. *See Wang*, 450 U.S. at 142–43, 101 S.Ct. 1027. The nature of these restrictions makes it clear that the motion to reopen was not designed to deal with petitioners who simply sought to supplement the record with evidence of facts that had developed during the pendency of the appeal. The restrictions on a motion to reopen were intended to establish a high barrier to relief, and, in fact, did so. However, they were intended to establish a high barrier to someone other than a petitioner seeking to provide additional evidence during the pendency of an appeal.

In sum, because of the unique discretionary authority to grant suspensions of deportation conferred to the BIA by the Attorney General, the BIA was required to determine statutory eligibility for the exercise of such discretion based on current evidence. Because of this unique delegation, the BIA's process in considering appeals from IJs necessarily deviated from the normal contested case administrative procedure. The BIA had, and exercised,

the power to re-find facts. However, the BIA was inconsistent with respect to its treatment of relevant supplemental evidence tendered on appeal. It did not have formal procedures for consideration of such evidence. In some cases, it accepted the evidence; in other cases it remanded for further findings; and in some, like the present case, it declared itself precluded from entertaining the evidence. The BIA could, under highly restricted circumstances, consider evidence after a motion to reopen was filed and granted. However, the BIA would not grant a motion to reopen unless the applicant previously had established a prima facie case of statutory eligibility for relief.

Since the events in this case occurred, much has changed in both substantive and procedural immigration law. Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546 (Sept. 30, 1996). IIRIRA repealed the statutory remedy of suspension of deportation that is at issue in this case and replaced it with a remedy entitled cancellation of removal. INA § 240A, 8 U.S.C. § 1229b (1996). After April 1, 1997, any alien placed in removal proceedings faces generally higher standards to qualify for cancellation of removal that include a longer physical presence requirement, a more stringent standard of hardship, and omission of consideration of hardship to the aliens themselves. INA § 240A(b), 8 U.S.C. § 1229b(b). Section 240A(d) also provides special rules with respect to the termination and interruption of continuous physical presence. *See* IIRIRA § 309(c)(5); *see also Ram v. INS*, 243 F.3d 510, 518 (9th Cir.2001).

In addition, the Attorney General recently completely reorganized the procedures used by the BIA. The Attorney General was concerned with the process at

issue in the case under which the BIA would make factual findings on appeal. In that regard, he observed:

> It's a well-settled principle of our judicial system that courts of appeals do not lightly reopen the factual findings-factual findings of trial courts below .... Consequently, appellate courts normally disrupt the factual findings of trial courts only when the findings rise to the level of being clearly erroneous. *However, the Board of Immigration Appeals routinely ignores this fundamental principle of appellate review.* In effect, the board gives immigrants two bites at the apple, two opportunities to present their facts.

Attorney General Speech (emphasis added).

Because of this concern, and the Attorney General's recognition of the enormous delay by the BIA in processing immigration appeals, the Attorney General promulgated new regulations effective September 25, 2002, which are designed to streamline administrative appellate review, including a provision that, with certain exceptions, generally prohibits the introduction and consideration of new evidence in proceedings before the BIA. *See* Procedural Reforms, 67 Fed.Reg. at 7311–12, 7315. The BIA also substantially has revised its procedures regarding motions to reopen. The current regulations are quite different from, and much more elaborate than, those in place at the time of the appeal to the BIA in this case. *See* 8 C.F.R. § 3.2 (2002).

However, neither the substantive nor procedural changes are applicable to this case. Deportation proceedings were initiated against Ramirez–Alejandre on May 4, 1990. The BIA issued its decision on June 6, 2000. Therefore, this case is governed by the transitional rules of IIRIRA. *Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir. 1997). Accordingly, Ramirez–Alejandre

remains eligible for suspension of deportation under pre-IIRIRA law and the new remedy of cancellation of removal is not applicable. Because the new procedural regulations were promulgated after the BIA issued the instant decision in this case, they also are not relevant to the issues presented in this case.

■ IIRIRA altered our review of the BIA decisions in suspension of deportation cases. "Under the transitional rules, we lack jurisdiction to review the discretionary determination whether an alien seeking suspension of deportation ... has met the statutory eligibility requirement of 'extreme hardship.'" *Sanchez–Cruz v. INS*, 255 F.3d 775, 778–79 (9th Cir.2001) (citing *Kalaw*, 133 F.3d at 1152); *see also* IIRIRA § 309(c)(4)(E). We also lack jurisdiction to review the Attorney General's discretionary decision whether to grant suspension once eligibility is determined. *Sanchez–Cruz*, 255 F.3d at 779; *Kalaw*, 133 F.3d at 1152. IIRIRA also precluded appellate courts from remanding cases to the BIA for the taking of additional evidence under 28 U.S.C. § 2347(c). *Altawil v. INS*, 179 F.3d 791, 793 (9th Cir.1999).

■ Notwithstanding these statutory limitations on judicial review, we retain the power to review constitutional due process challenges to immigration decisions. *Sanchez–Cruz*, 255 F.3d at 779. This review is *de novo. Id.* In deciding whether agency procedures comport with due process, we do not defer to the agency. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (noting that administrative agencies have great latitude in crafting rules of procedure only "[a]bsent constitutional constraints").

Now that we have set the historical context, we turn to the specifics of this case.

## II

Ramon Ramirez–Alejandre is forty-four years old and was born in El Rincón, Michoacan, Mexico. Approximately twenty-three years ago, Ramirez–Alejandre entered the United States without inspection and found gainful employment as a gardener and landscaper. By age thirty-four, Ramirez–Alejandre had advanced in his career and was working as a project foreman, responsible for supervising the maintenance crew of a 400–unit condominium project. During the 1980s, Ramirez–Alejandre started a family with his common-law wife who also was undocumented. Their first child, Elizabeth, entered the country without inspection and their second, Edith, became a United States citizen by birth. Five of Ramirez–Alejandre's six brothers live in the United States and have acquired permanent legal status. Ramirez–Alejandre's mother, sister, and remaining brother live in Mexico. Ramirez–Alejandre's father was murdered in Mexico in 1985. There is no record of Ramirez–Alejandre being arrested, abusing substances, or receiving public assistance.

On May 4, 1990, the INS issued an Order to Show Cause, charging Ramirez–Alejandre with entering the United States without inspection in violation of INA § 241(a)(2), 8 U.S.C. § 1251(a)(2) (1990). On March 9, 1992, Ramirez–Alejandre appeared before an IJ, conceded deportability, and applied for suspension of deportation. The IJ carefully considered the record and determined that Ramirez–Alejandre established physical presence in the United States "since 1983 or even before" despite insignificant departures from the country; that he established good moral character despite using false documents to secure employment, failing to file income tax forms, and failing to disclose information to the INS at his arrest; and that he demonstrated that his deportation would result in extreme hardship to both himself in light of the "grinding poverty" in Mexico and to his United States citizen daughter in light of Mexico's decreased educational opportunities and unavailability of quality health care. The IJ described Ramirez–Alejandre as "a role model" who "would be relegated to the grinding poverty of ... Mexico without ... any hope for anything in the future" if he were deported and thus granted Ramirez–Alejandre relief in accordance with its exercise of discretion. The INS appealed the IJ decision on March 17, 1992, alleging that Ramirez–Alejandre had failed to establish any of the statutory elements required to demonstrate eligibility for relief and that, even if he had, the BIA should not exercise its discretion to grant relief. Ramirez–Alejandre argued that the INS was raising new issues on appeal, that statutory eligibility had been met, and that the BIA should defer to the IJ's findings.

On January 7, 1993, after briefing on the appeal was completed and before the BIA issued its decision, Ramirez–Alejandre requested that evidence with respect to his daughter Edith's medical condition that had arisen subsequent to the IJ hearing be included in the record and considered in support of his suspension application. Ramirez–Alejandre submitted with his request a November 10, 1992 letter from his daughter's primary care physician attesting that Edith had suffered reoccurring bouts of otitis media over the past year. Although she had been able to receive adequate treatment in the United States, the physician cautioned that if such condition were untreated, the reoccurring ear infections could result in "severe hearing loss and developmental delay and learning impairment." The physician stated his belief that if Edith were returned to Mexico, her access to medical treatment at best would be inadequate and that it was likely

she would be unable to receive any treatment for the condition.

On November 3, 1994, Ramirez–Alejandre filed a supplemental brief and twenty-four additional documents. Ramirez–Alejandre contended that the IJ made no error in granting relief. He nonetheless requested that if the BIA determined that the IJ made its decision in error, the BIA consider the evidence before issuing a decision.

Ramirez–Alejandre's supplemental evidence included records that Ramirez–Alejandre had no history of criminal arrests or convictions, that he had been residing continuously in the United States since 1979, that he paid back taxes, that he was an active member and regular volunteer in his church, that his landlord attested to his reliability as a tenant, and that many friends and relatives wrote of his involvement in their lives. The record also presented an ambiguity with respect to the status of Ramirez–Alejandre's health. It was undisputed that Ramirez–Alejandre suffered a severe back injury on January 3, 1994 causing him to be disabled. Two letters from Ramirez–Alejandre's chiropractor and employer, however, make it unclear whether Ramirez–Alejandre fully recovered, was able to work with continued rehabilitation, or remained disabled. On November 18, 1994, the INS filed a response requesting that the BIA not consider this evidence.

On March 9, 1998, the BIA requested supplemental briefing with respect to whether Ramirez–Alejandre remained eligible for suspension of deportation. The INS responded by arguing that Ramirez–Alejandre had established only two years of physical presence pursuant to the provisions contained within IIRIRA. Ramirez–Alejandre contended that IIRIRA was not applicable to the present circumstances and again offered to provide relevant evidence of hardship facing Ramirez–Alejandre and his citizen daughter that had developed in the years since the date of the original hearing.

The BIA rendered its decision on June 6, 2000, affirming the IJ's conclusions with respect to physical presence and good moral character. The BIA agreed that Ramirez–Alejandre had demonstrated physical presence but established the date of commencement to be "May 5, 1979" rather than the IJ's finding that Ramirez–Alejandre had resided in the country "since 1983 or even before."

The BIA, however, reversed the grant of relief after determining that Ramirez–Alejandre had not demonstrated extreme hardship. In reaching its conclusion, the BIA noted that, while Ramirez–Alejandre had "submitted additional evidence on appeal. that he claims supports a finding of 'extreme hardship,' this Board as an appellate body does not consider evidence submitted for the first time on appeal." The BIA did not state in its opinion that it had refused to consider the evidence because of the form in which it was submitted. Rather, it said that it simply does not consider evidence submitted for the first time on appeal. As our historical examination clearly indicates, the BIA's statement was untrue.

Ramirez–Alejandre timely petitioned for review of the BIA's decision. A three-judge panel of this Court denied his petition in a split decision. *See Ramirez–Alejandre v. Ashcroft*, 276 F.3d 517 (9th Cir.2002). Thereupon, a majority of the non-recused active judges of this Court voted to rehear the case *en banc*. *Ramirez–Alejandre v. Ashcroft*, 285 F.3d 1173 (9th Cir.2002).

### III

■ The question in this case is whether, under the law and procedure applicable at the time, the BIA's categorical refusal

to provide a procedure by which Ramirez–Alejandre might tender new evidence relevant to the establishment of prima facie eligibility for suspension of deportation violated his right to due process of law.

The Supreme Court recently affirmed that "the Due Process clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis,* 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (citations omitted). "A BIA decision violates due process if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Sanchez–Cruz,* 255 F.3d at 779 (citation and internal quotation marks omitted); *see also Zahedi v. INS,* 222 F.3d 1157, 1164 n. 6 (9th Cir.2000) (stating that "immigration proceedings as a whole" are governed "by the Fifth Amendment's Due Process Clause"). An alien asserting a due process challenge must show prejudice. *Sanchez–Cruz,* 255 F.3d at 779; *Campos–Sanchez v. INS,* 164 F.3d 448, 450 (9th Cir.1998). As we have noted, despite the fact that "[t]here is no administrative rule requiring the Board to review all relevant evidence submitted on appeal[,][i]t is beyond argument, ... that the Due Process Clause requirement of a 'full and fair hearing' mandates that the Board do so in its capacity as a reviewing tribunal." *Larita–Martinez v. INS,* 220 F.3d 1092, 1095 (9th Cir.2000) (internal citation omitted).

In the instant case, the BIA violated Ramirez–Alejandre's right to due process of law by stating that it was entirely precluded from considering new evidence on appeal. As we have noted, the BIA was charged at the time with considering current evidence as to extreme hardship. *Chookhae,* 756 F.2d at 1352. However, on the occasions that Ramirez–Alejandre submitted supplemental evidence to the BIA,

there was no established procedure available whereby Ramirez–Alejandre could seek to introduce into the record legally significant evidence relating to changed or additional circumstances. The BIA had, as we have discussed, accepted supplemental evidence in other cases. However, in this case, it refused to do so, falsely claiming that "this Board as an appellate body does not consider evidence submitted for the first time on appeal." Thus, Ramirez–Alejandre was precluded, in ways that other applicants were not, from presenting new evidence relevant to the establishment of prima facie eligibility for suspension of deportation. This left him unable to "reasonably present[ ] his case." *Sanchez–Cruz,* 255 F.3d at 779 (internal quotation marks omitted). Thus, he was denied due process of law.

In *Larita–Martinez,* in considering a due process challenge similar to the one at bar, we recognized the presumption that the BIA reviewed all the evidence on appeal, including supplemental evidence. *See* 220 F.3d at 1095–96. By contrast, in the instant case, the BIA affirmatively and categorically rejected consideration of supplemental evidence. As we noted in *Larita–Martinez,* 220 F.3d at 1095:

> There is no administrative rule requiring the Board to review all relevant evidence submitted on appeal. It is beyond argument, however, that the Due Process Clause requirement of 'a full and fair hearing' mandates that the Board do so in its capacity as a reviewing tribunal. (citation omitted).

Of course, the BIA is not obligated to accept all materials tendered by a party after an immigration hearing. Agencies are afforded wide latitude in the formulation of administrative procedure. *Vermont Yankee Nuclear Power,* 435 U.S. at 524–25, 98 S.Ct. 1197. The BIA may place appropriate restrictions on the type of evi-

dence it will consider and set standards for relevancy and admissibility. However, when it is charged with the determination of facts as they exist at the time the case is finally decided, it may not categorically refuse to consider any tendered supplemental evidence at all.

In the instant case, the evidence tendered by Ramirez–Alejandre was not rejected because of any concerns about form, relevancy, admissibility, or his failure to demonstrate exceptional circumstances existed. It was rejected because the BIA stated that it was precluded as a matter of law from considering it, despite prior decisions requiring it to consider such evidence and despite the fact that it was receiving such evidence in other cases. Thus, we must assume, as we have in the past under similar circumstances, that any purported failure to comply with procedural requirements was not the stated reason for the BIA's failure to consider the new evidence. *See, e.g., Ubau–Marenco v. INS,* 67 F.3d 750, 757–58 n. 9 (9th Cir.1995), *overruled on other grounds by Fisher v. INS,* 79 F.3d 955, 963 (9th Cir.1996) (en banc). Perhaps more important, on many other occasions, the BIA has accepted evidence on appeal that was presented in the same format used by petitioner. In *Charlesworth,* for example, the BIA relied on a letter that the INS just sent in on appeal. 966 F.2d at 1325. In *Hazzard,* the BIA considered documents on appeal that were just sent in with an appellate brief. 951 F.2d at 437. In the case of *In re Min Song,* Int. Dec. # 3455, 2001 WL 1030900 (BIA 2001), the BIA relied on unverified documents that were just sent in with the petitioner's brief. In *Matter of Lin Lee,* 19 I. & N. Dec. 435, 436, 1987 WL 108941 (BIA 1988), the BIA relied on new documents submitted on appeal in granting relief.

The INS contended for the first time at oral argument that the availability of a post-hearing § 3.2 motion to reopen provided Ramirez–Alejandre with an adequate means of presenting his evidence. However, it did not. First, as we have noted, a motion to reopen was not available unless the applicant has first established a prima facie case. Here, the BIA held that Ramirez–Alejandre had not established a prima facie case; thus, a motion to reopen was not available to him as a matter of law under the operative BIA regulations. Second, as we have also noted, a § 3.2 motion to reopen was available only after the BIA had issued its decision; it was not a vehicle for tendering new relevant evidence for the BIA's consideration prior to reaching a decision. Finally, as we noted earlier, the need to present new evidence in a long-delayed appeal can hardly be characterized as "exceptional" or "extraordinary."

The INS also argued that Ramirez–Alejandre could have moved to reopen the IJ's decision to present additional evidence while the case was pending on appeal. First, under § 3.2 as it existed at the relevant time, the purpose of a motion to reopen was to obtain further relief. Ramirez–Alejandre already had obtained favorable relief from the IJ, so there was no further relief to be sought. Indeed, the INS has been unable to cite any case in which a motion to reopen was allowed to be filed by a prevailing party for the purposes of placing additional favorable evidence in the record. Second, the filing of such a motion would have required Ramirez–Alejandre to forfeit the relief he had won. The BIA has held that "where an alien moves to reopen her deportation proceedings, she is effectively asking that the previous decision ordering her deported be set aside so that she may present new evidence to support an application for relief from deportation." *In Re M–S–,* Int. Dec. # 3369, 1998 WL 769392 (BIA 1998). Third, by the time Ramirez–Alejandre made his third attempt to supplement the

record, his application for § 3.2 relief before the IJ was precluded. The BIA changed the operative regulations in 1996, four years before it issued its decision, providing that an applicant was limited to one motion to reopen and such motion was to be made only "90 days after the date on which the final administrative decision was rendered in the proceeding." 8 C.F.R. § 3.2(c)(2) (1996). Further regulatory amendments also stated that no applicant may file a motion to reopen or reconsider the IJ decision once the BIA assumes jurisdiction of the case. 8 C.F.R. § 3.23(b) (Apr. 29, 1996). Thus, as of 1996, Ramirez–Alejandre had lost his right to file a motion to reopen or reconsider the immigration hearing. There was no well-worn path available to him; all paths had been closed.

The INS also contends that Ramirez–Alejandre had another remedy on appeal in the form of a motion to remand the case to the IJ pursuant to *Matter of Coelho*, which for the first time described the BIA's informal and haphazard motion practice. 20 I. & N. Dec. 464. However, as the BIA stated in *Coelho*, a remand was not allowed unless the "evidence presented would likely change the result in the case." *Id.* at 473. In short, the remedy of remand was not intended as a vehicle for the prevailing party to supplement the record. Rather, it was designed as a method by which the losing party could present new evidence so that the IJ might reconsider the original decision. Thus, it plainly did not apply to petitioners such as Ramirez–Alejandre, who had won favorable relief before the IJ, and simply wanted to bolster the record on appeal with new, previously unavailable evidence.

Moreover, the BIA construed a motion to remand as the functional equivalent of a motion to reopen. *Id.* at 471. Under BIA procedure, a motion to remand must meet all the requirements of a motion to reopen

and the two are treated the same. *Rodriguez v. INS*, 841 F.2d 865, 867 (9th Cir. 1987). Thus, all of the restrictions pertaining to a § 3.2 motion to reopen applied with equal force to a remand motion. In particular, the BIA has held that the procedures applicable under § 3.2 applied to motions to remand, including the requirement that motions be filed within 90 days of the decision. *In re OPARAH*, 2000 WL 1899793, File A71 798 305 B (BIA 2000) (publication page references are not available for this document.); *see also* 8 C.F.R. § 3.2(c)(4) (1998). Thus, at the time Ramirez–Alejandre wanted to supplement the record, any motion to remand would have been time-barred.

In short, the operative regulations failed to provide Ramirez–Alejandre with any procedural avenue by which he could request that the BIA consider relevant supplemental evidence prior to the time it made its decision. His acknowledgment of the existence of the procedures at oral argument does not alter the fact that they were not legally available to him at the operative time.

What is not before us is the question of whether Ramirez–Alejandre submitted the evidence in the proper form or using the proper procedure. The BIA did not reject Ramirez–Alejandre's proffered evidence on those grounds, and the INS conceded at argument that the material Ramirez–Alejandre sought to add to the record would have been admissible at an immigration hearing. In fact, similar material tendered in the same form was, in fact, admitted at Ramirez–Alejandre's immigration hearing.

We also are not confronted with the question of whether the BIA should have considered the evidence because the case presented "exceptional circumstances." The BIA did not reject the evidence at issue as failing to meet that standard; it

simply announced it never considered evidence on appeal under any circumstances.

Further, the case before us does not contain any issues for us to decide concerning Ramirez-Alejandre's eligibility for relief. The BIA and IJ both affirmed findings that Ramirez–Alejandre possessed the qualifying good moral character, rendering any second-guessing of his character on appeal moot. With respect to findings of extreme hardship, the evaluation of relevant evidence must be reserved for the BIA on remand. *INS v. Ventura,* — U.S. ——, 123 S.Ct. 353, 355–56, 154 L.Ed.2d 272 (2002). In addition, the BIA has discretion to determine when a proceeding should be remanded to the IJ, *see INS v. Doherty,* 502 U.S. 314, 323, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992), and nothing in this analysis should be construed as limiting that discretion. However, the BIA rejected the evidence at issue on the sole ground that it was precluded as a matter of law from considering it; and it is on that exclusive basis that we must consider whether Ramirez–Alejandre's due process rights were violated. We do not hold that an applicant for discretionary suspension of deportation has a constitutional due process right to require the BIA to consider any supplemental information the alien wishes to submit after the IJ hearing. However, it is one thing to reject tendered evidence because of form or irrelevance; it is quite another to prevent one party from presenting it at all based on a purported categorical rule, while accepting supplemental evidence from others with alacrity.

Thus, as applied to this petitioner, BIA procedures that existed at the time violated his right to due process of law. Although the BIA determined eligibility on the basis of the facts as they existed at the time of the BIA decision, the BIA denied Ramirez–Alejandre the opportunity to tender relevant supplemental evidence that had developed in the eight years after his hearing before the IJ. The BIA did so on the basis of a purported rule, not found in the regulations, that it categorically would not accept supplemental evidence on appeal, despite the fact that it was required to determine the application based on current facts, that it retained the power not only to accept new evidence on appeal, but to "re-find" the facts as determined by the IJ, and that it had accepted supplemental evidence in other cases. By precluding Ramirez–Alejandre from any means of tendering evidence to it under these circumstances, the BIA deprived him of due process of law.

## IV

As a predicate to obtaining relief for a violation of procedural due process rights in immigration proceedings, an alien must show that the violation prejudiced him. *Sanchez–Cruz,* 255 F.3d at 779; *Campos–Sanchez,* 164 F.3d at 450. This standard is met under circumstances in which an alien's rights are violated "in such a way as to affect potentially the outcome of their deportation proceedings." *United States v. Cerda–Pena,* 799 F.2d 1374, 1379 (9th Cir.1986) (citation and emphasis omitted). In assessing prejudice in this context, we need not determine with certainty whether the outcome would have been different, but rather whether the violation potentially affected the outcome of the proceedings. In this case, the question is whether the tendered evidence had the potential to affect the BIA's determination of extreme hardship.

As the Supreme Court has noted, the words "extreme hardship," as used in the statute, "are not self-explanatory, and reasonable men could easily differ as to their construction." *Wang,* 450 U.S. at 144, 101 S.Ct. 1027. Thus, the Attorney General has been vested with the authority to con-

strue the phrase. *Id.* at 145, 101 S.Ct. 1027. As the BIA observed in the instant case:

"Extreme hardship" is not an easily definable term of precise or inflexible content. Instead, the elements required to establish "extreme hardship" are dependent upon an evaluation of the facts and circumstances peculiar to each case. *Matter of Chumpitazi,* 16 I. & N. Dec. 629, 1978 WL 36459 (BIA 1978); *Matter of Kim,* 15 I. & N. Dec. 88, 1974 WL 30006 (BIA 1974). *See also Jara-Navarrete v. INS,* 813 F.2d 1340 (9th Cir. 1986).

*In re Ramirez-Alejandre,* No. A 70 450 725, at 2 (Jun. 6, 2000).

However, in evaluating hardship in suspension cases, the BIA has identified a number of relevant factors. As the BIA has stated:

We consider the age of the respondents, both at entry and at the time of their application for relief; their family ties in the United States and abroad; their length of residence in the United States over the minimum requirement; their own health, as well as that of their United States citizen children; political and economic conditions in [their native country]; the financial impact of departure from the United States; the possibility of other means of adjusting their status in the United States; their involvement and position in their local community; and their immigration history.

*In re Kao,* 23 I. & N. Dec. 45, 2001 WL 534294 (BIA 2001) (citing *Matter of Anderson,* 16 I. & N. Dec. 596, 1978 WL 36475 (BIA 1978)).

We consistently have held that because the determination of extreme hardship is made on a fact-specific basis, it is incumbent upon the BIA to consider all factors bearing on that determination. *Ordonez v. INS,* 137 F.3d 1120, 1123 (9th Cir.1998)

(noting that the BIA abuses its discretion if it fails to consider all relevant factors bearing on extreme hardship); *Santana-Figueroa v. INS,* 644 F.2d 1354, 1356 (9th Cir.1981) (finding that "discretion can be properly exercised only if the circumstances are actually considered. When important aspects of the individual claim are distorted or disregarded, denial of relief is arbitrary.") (internal citation omitted).

■ The supplemental evidence that Ramirez-Alejandre attempted to tender was relevant to establishing these factors. It involved the additional eight years of residence in the United States, it updated information concerning the financial impact of departure from the United States, and it presented facts concerning his community involvement. *See Kao,* 23 I. & N. Dec. 45 (enumerating such factors in extreme hardship determinations). In addition, the BIA grants significant weight to whether the health and well-being of a child would be affected adversely by deportation, especially if such child is a United States citizen. *See, e.g., Kao,* 23 I. & N. Dec. 45 (stating that the alien couple "can establish their eligibility for suspension of deportation if they demonstrate that their deportation would result in extreme hardship on their United States citizen children"); *In re L-O-G-,* 21 I. & N. Dec. 413, 421-22, 1996 WL 403255 (BIA 1994) (finding likelihood of success in demonstrating extreme hardship based on four factors. The first three dealt exclusively with the hardship a six year old child likely will encounter if deported.).

Ramirez-Alejandre also tendered evidence demonstrating that he had been active in his church community and in the lives of friends and relatives for nearly twenty years. We have held in other circumstances that the BIA had abused its discretion by not considering similar evidence of community ties. *Santana-Fi-*

*gueroa*, 644 F.2d at 1357; *see also Urbina–Osejo v. INS*, 124 F.3d 1314, 1319 (9th Cir.1997); *Gutierrez–Centeno v. INS*, 99 F.3d 1529, 1534 (9th Cir.1996). We also have determined that the BIA errs if it fails to consider the health of the petitioner and the petitioner's family, including evidence such as Ramirez–Alejandre's dependence on the medical treatment he received for his back problems. *See Batoon v. INS*, 707 F.2d 399, 402 (9th Cir.1983). We have further held that the BIA erroneously disregards any evidence concerning the hardship of the separation of the alien from family members living in the United States, which would include evidence that Ramirez–Alejandre has been living in the United States for over twenty years and that five of Ramirez–Alejandre's seven siblings have permanent legal status in this country. *Salcido–Salcido v. INS*, 138 F.3d 1292, 1293 (9th Cir.1998) (per curiam).

We also have directed the BIA to give particular attention to whether a deportation will disrupt the lives of children, especially those who have remained in the country during their early formative years due to the delay caused by the INS or BIA. Edith was born in this country and, at the time that the BIA opinion issued, was nine years old. Elizabeth was six at the time of the original hearing and was fourteen years old at the time of the BIA's decision. Evidence with respect to the daughters' language skills, educational attainment, medical conditions, ties to the community, ability to adapt to a foreign country, and impact on life opportunities are factors that the BIA is compelled to consider. *See, e.g., Casem v. INS*, 8 F.3d 700, 703 (9th Cir.1993) (reversing and remanding for BIA to consider impact deportation would have on child who aged five years while suspension application was on appeal); *Gutierrez–Centeno*, 99 F.3d at 1534 (finding BIA erred in part for failing to consider how children who spent seven of their formative years in the United

States would be impacted by deportation); *Prapavat v. INS*, 662 F.2d 561, 563 (9th Cir.1981) (establishing that factors that adversely impact a citizen child such as "deportation to an underdeveloped country that offers minimal opportunities for suitable employment, the child's lack of knowledge of that country's language, her health problems, and the economic loss from the forced liquidation of the [aliens'] assets must all be assessed in combination").

Thus, any fair consideration of the evidence tendered, in light of the applicable law and the BIA's own standards, shows that it was relevant and significant to a determination of extreme hardship. Indeed, similar factors to those found in the instant case were sufficient to establish that an alien met the more heightened extreme hardship standard operative in the new cancellation remedy. *See, e.g., In re Recinas*, 23 I. & N. Dec. 467, 2002 WL 31173154 (BIA 2002). Such similarities are notable in light of the fact that it is undisputed that the tendered evidence would have been admissible before an IJ or the BIA.

Perhaps more important, this was an extremely close case. Even without the evidence submitted by Ramirez–Alejandre on appeal, the IJ determined that he had established the element of extreme hardship. When the BIA reversed on the same record, the panel split 2–1.

It is indisputable that all of the supplemental evidence, and in particular the evidence pertaining to the health and well-being of Ramirez–Alejandre's daughters, would have bolstered greatly Ramirez–Alejandre's claim that he would face extreme hardship if deported. Whether or not the supplemental evidence absolutely would entitle Ramirez–Alejandre to suspension of deportation is not for us to say. However, it unquestionably had the potential for likely altering the outcome under

the BIA's own precedent and our case law applicable to this type of relief. Thus, Ramirez–Alejandre has provided sufficient evidence to show prejudice and to warrant a remand. *Cerda–Pena,* 799 F.2d at 1378–79.

V

This case comes to us in a narrow context, involving now-repealed procedures applicable to a now-repealed remedy involving a petitioner who was in the unusual position of prevailing before the IJ, but wished to supplement the record with current information during the lengthy appeal for the BIA's discretionary consideration. Under the circumstances presented by this case, and the procedures and law applicable at the time, the petitioner was denied the right to present reasonably his case in a full and fair hearing. Under applicable law, the BIA was required to determine extreme hardship as of the time it decided the case. Eight years had elapsed since the hearing before the IJ; however, Ramirez–Alejandre arbitrarily was denied the opportunity to request the submission of legally relevant, supplemental evidence based on a rule that was applied arbitrarily and capriciously.

We grant the petition for review and remand to the BIA for reconsideration of the tendered evidence without application of the categorical exclusion rule upon which it relied in this case, namely that "this Board as an appellate body does not consider evidence submitted for the first time on appeal." We neither express an opinion as to whether the BIA should accept or reject the tendered evidence on any other basis, nor do we preclude the BIA from taking any other appropriate administrative action with respect to the evidence. We express no opinion on the ultimate merits of the petition.

**PETITION GRANTED AND REMANDED.**

TROTT, Circuit Judge, Dissenting, with whom O'SCANNLAIN, GOULD, TALLMAN, and RAWLINSON, Circuit Judges, join.

"A motion to reopen is one of two ways, a motion to reopen, or just send it in. It violates due process to ignore what we sent in."

Counsel for petitioner (explaining during oral argument the nature of his claim).

I

Ramirez–Alejandre claims that the BIA's decision not to consider new factual information "just sent in" for the first time on appeal regarding the merits of his request for suspension of deportation constituted a denial of due process of law. There are four main reasons why his claim fails.

First, the method he chose to attempt to bring this information to the BIA was simply informational and by choice did not comply with the applicable procedure and published rules. *See Matter of Coelho,* 20 I. & N. Dec. 464, 471–72, 1992 WL 195806 (B.I.A.1992); 8 C.F.R. §§ 3.2, 3.8 (1991, 1996). Second, he had an opportunity prior to the BIA's final decision properly to augment the record with this information, in the form at least of a motion in the alternative, but, although he was aware of this opportunity, he admits he chose not to take advantage of it. Thus, the information never became part of the record as *evidence* and thus was no more than hearsay. Third, he had another opportunity to move to reopen after the BIA ruled against him, but he deliberately did not do so. Fourth, his situation did not in any manner approximate "exceptional circumstances" such that the Constitution mandated reopening of the evidentiary record.

Given that *he,* not the BIA, is responsible for the missed opportunities that form the predicate for his claim of constitutional

foul, we should reject out of hand his due process claim as demonstrably lacking in merit. To quote the test relied on by the majority, Ramirez–Alejandre must show that "the proceeding was so fundamentally unfair that [he] was *prevented from reasonably presenting his case.*" *Sanchez–Cruz v. INS*, 255 F.3d 775, 779 (9th Cir. 2001) (quotation and citations omitted) (emphasis added). In a nutshell, no one and nothing prevented him from reasonably presenting his case.

Nevertheless, and with all respect, our friends in the majority have adopted an opinion that stands for the astonishing proposition that an illegal alien who is an applicant for discretionary suspension of deportation has a constitutional due process right to have the BIA, *sitting as an appellate court,* "consider" on the merits unverified *factual* information "just sent in" for the first time by the applicant on appeal, information that has not been tested, cross-examined, subjected to any of the usual forms of authentication ordinarily required in an adjudicatory setting, or made a part of the evidentiary record. Just shovel something over the BIA's transom *after* the hearing conducted by the IJ, and the Constitution requires the BIA to take whatever-it-is into consideration in making its decision, even in circumstances where the party delivering the information fails to make a motion to make the information a formal part of the record. This unprecedented holding cannot be correct, as I shall attempt to demonstrate; and, because it masquerades as a constitutional imperative, it threatens *all* rules enacted by the BIA, old or new, governing the *receipt* and the consideration on appeal of potential new evidence, as well as what the record consists of in these cases.

The majority's conclusion from this record is that "Ramirez–Alejandre was *denied the opportunity to request the submission of legally relevant supplemental evidence*

based on a rule that was applied arbitrarily and capriciously." (Emphasis added). Not only has Ramirez–Alejandre not made the claim to us in either his petition for review or any of his briefs that he was "*denied the opportunity* to request the submission of evidence," but the majority's conclusion is plainly wrong.

To illustrate that the problem of which Ramirez–Alejandre complains is entirely of his own making and falls a legal country mile short of supporting either (1) his constitutional due process argument, or (2) the argument the majority has plucked from thin air on his behalf, a few facts are in order.

To begin with, we have the manifestly informal manner in which Ramirez–Alejandre attempted to bring his new information to the BIA's attention after the IJ had rendered his decision and the matter was on appeal. After briefing to the BIA was completed, Ramirez–Alejandre forwarded on January 7, 1993, a letter dated November 10, 1992, to the Board from his daughter's primary care physician (indicating that she had suffered several bouts of ear infections throughout the year) with the bald request that the "letter be included in the record of proceeding and considered in support of[his] application for suspension of deportation." The doctor's letter itself was unauthenticated and not offered in affidavit or declaration form. The doctor's signature was not notarized. It did not comply with the Rules. It was not "evidence."

On November 3, 1994, Ramirez–Alejandre filed a supplementary brief in general support of his application for suspension of deportation, attaching 24 additional documents. He now admits that much of the information attached to his brief was not new and could have been presented to the IJ. Among the documents was a September 12, 1994, unverified letter from a doc-

tor of chiropractic associated with "The Back Doctors" indicating that Ramirez–Alejandre had suffered—after his hearing before the IJ—an injury to his back on January 3, 1994, which triggered workers compensation. The letter represented that Ramirez–Alejandre was currently on full disability. The letter said also, "I anticipate permanent disability." As in the case of the earlier doctor's letter, this one, too, lacked any indicia of admissibility as evidence—no affidavit, no declaration, no notary, no anything.

I note here that Ramirez–Alejandre demonstrated in his November 3, 1994, submission that he was fully aware of his opportunity formally to augment the factual record by making a proper motion and thereby to convert his assertions into evidence, but, as he candidly admitted during oral argument, he chose not to follow this well-worn path. Instead, he merely indicated in his papers filed with the BIA that *if* the *INS* made a motion to remand, he would not object, and I quote:

> However, if the INS believes it appropriate, *respondent will not oppose* a motion to remand the proceedings for a further evidentiary hearing so that the additional evidence can be considered.

(Emphasis added).

The INS then put Ramirez–Alejandre on actual notice that the INS opposed his casual attempts to add to the record on appeal information which was not before the IJ. On November 15, 1994, the Service filed a supplemental brief objecting to Ramirez–Alejandre's gambit, arguing that the Board's "review on appeal is limited to the record before the Immigration Judge." Under the headnote "Respondent's Additional Evidence Submitted on Appeal Should Not be Considered Part of the Record," the Service cited three cases in support of its position: *Matter of Soriano,* 19 I. & N. Dec. 764, 767, 1988 WL 235429 (B.I.A.1988) (remanding for consideration

of new information); *Matter of C,* 20 I. & N. Dec. 529, 530 n. 2, 1992 WL 200361 (B.I.A.1992) (declining to consider new evidence submitted on appeal and noting that no motion to reopen based on new evidence had been made); and *Matter of Haim,* 19 I. & N. Dec. 641, 642, 1988 WL 235452 (B.I.A.1988) ("A party seeking to reopen [the] proceedings must state the new facts which he intends to establish, supported by affidavits or other evidentiary material."). Thus, not only was he given a warning that his information would not be considered in its present condition and was not part of the record, but he was advised what to do and how to do it: make a motion in some form to reopen.

*Matter of Coelho* made it clear in 1992 to all applicants and counsel what steps were necessary to substantively and procedurally augment factual records with respect to the merits of a claim. Here is the BIA's description of the process:

> Motions to remand are an accepted part of appellate civil procedure and serve a useful function. Where a motion to remand simply articulates the remedy requested by an appeal, we treat it as part of the appeal and do not require it to conform to the standards for consideration of motions. However, where a motion to remand is really in the nature of a motion to reopen or a motion to reconsider, it must comply with the substantive requirements for such motions. The requirements for these motions are set forth at 8 C.F.R. §§ 3.2 and 3.8 (1991). In this instance, the motion to remand is in the nature of a motion to reopen since the respondent requests additional proceedings to present evidence regarding his rehabilitation which was not available during the initial proceedings.

20 I. & N. Dec. at 471, 1992 WL 195806 (internal citations omitted).

The majority attempts unconvincingly to dilute *Coelho* by dismissing it as merely a reference to "motions practice." Although we use case law in this fashion on a routine basis to advise litigants of the rules of the road, the majority reasons that the same practice offends the Constitution when used by the BIA.[1] Why? I believe it is a mistake not to regard *Coelho* as authoritative precedent which controls the disposition of this case.

Nevertheless, on May 6, 1998, almost four years later, Ramirez–Alejandre submitted yet another supplemental brief in which he stated that "[i]f the Board will permit respondent another evidentiary hearing, *additional evidence* of the hardship he and his United States citizen child will suffer can be offered." (Emphasis added). Notwithstanding Rules 3.2 and 3.8 requirements of a showing of materiality, unavailability, and indiscoverability at the IJ's hearing, Ramirez–Alejandre made no attempt by affidavit or otherwise to indicate what such "additional evidence" might be or how it might affect the BIA's decision.

The BIA handed down its decision on June 6, 2000. The Board held that Ramirez–Alejandre had not shown extreme hardship. Its decision noted also that while Ramirez–Alejandre had "submitted additional evidence on appeal that his claims support a finding of 'extreme hardship,' this Board as an appellate body does not consider evidence submitted for the first time on appeal. *Matter of Fedorenko*, 19 I & N Dec. 57, 74, 1984 WL 48585 (BIA 1984)."

To illustrate the folly of accepting "for consideration" Ramirez–Alejandre's "evidence" at face value, one need look no deeper than his November 3, 1994, supplementary brief and the attached unverified letter from "The Back Doctors" claiming, without proof, that "Mr. Ramirez is suffering from an acute upper thoracic and cervical spine condition. . . . The patient at the present time is on full disability and is expected to remain so for the next two months. I anticipate permanent disability and the patient to be eligible for re-habilitation." This letter is dated September 12, 1994, and gives the date of Ramirez Alejandre's injury as "January 3, 1994." Yet, a mere fifteen pages later in the same submission we find a letter dated September 28, 1994,—16 days after the date of The Back Doctors' letter—which reads,

> Ramon Ramirez works for Heather Farms Landscape, Inc.[ ] He has been an excellent worker and has been a project foreman for approximately 3 years. He has been responsible for the over all maintenance [sic] of a 400 unit condominium complex. To include the supervision of three other workers and/or maintenance crew. We look forward to seeing Ramon continue employment with Heather Farms Landscape. Ramon has been employed with Heather Farms Landscape for four years.

Given the date of Ramirez–Alejandre's injury specified in The Back Doctors' letter, January 3, 1994, and that letter's claims of "acute" condition, "full disability," and "anticipate[d] permanent disability," someone has some explaining to do. Counsel's supplementary brief accompanying these mutually impeaching letters calls Ramirez–Alejandre "permanently disabled" and claims it is "unlikely that he will be able to do manual labor again." Yet, in "support" of his dire description and prediction, the same counsel included in this same package yet another suspicious unverified letter, this one from Jose

---

1. For example, ordinarily we do not entertain an issue raised for the first time on appeal, even if that issue has merit. However, we claim the discretion to do so as we see fit. *A–1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 338–39 (9th Cir.1996).

Juan Bernal, the "Pastoral Administrator" of Ramirez–Alejandre's church. Pastor Bernal tells us in this letter of August 30, 1994, that Ramirez–Alejandre "is in charge of getting the group going and singing, every Monday that they have their meetings. He is also the one in charge of putting things in order and cleaning the halls. He does this with joy and enthusiasm."

When it helps his case to be hurt and permanently disabled, he is hurt and disabled. When it helps his case to be a good worker and permanently employed, he is just that. But both at once? I repeat, not one of these letters was verified, notarized, or tendered in affidavit form. Can this be information which the BIA has a constitutional duty to consider unless and until it is part of the record?

The Service opposed Ramirez–Alejandre's request for suspension of deportation in large measure based on *record* evidence of lies, deception, and dishonesty on his part. The INS asserted that he had failed to establish good moral character as required by the Immigration and Nationality Act in that during his illegal tenure in the United States he had used at least four false names, four false Social Security cards, had purchased and used a fake alien registration card, and had lied about several material issues to immigration officers when he was arrested, including whether he or his family had ever received public assistance benefits. Suffice it to say here that none of this uncontested evidence of Ramirez–Alejandre's life outside the law helps his dubious assertion of inability to work and permanent disability. The point of this discussion is not to cast aspersions at Ramirez–Alejandre, but to call attention to the fact that the *only* place these issues can be adequately sorted out and made a part of the record is in a proper hearing, not helter-skelter on appeal. In a hearing setting, information does not become part of the evidentiary record until it is properly offered and received.

Ramirez–Alejandre might as well have dropped off this untested, unverified, unauthenticated, and untrustworthy material in a plain brown wrapper. With all respect to counsel, this informal method of attempting to inform the Board on appeal of new facts is hardly the stuff of which how-to-do-it continuing education of the Bar courses, or, for that matter, constitutional claims are made.

But, now, as we probe for persuasive evidence that Ramirez–Alejandre was "*prevented* from reasonably presenting his case," *Sanchez–Cruz,* 255 F.3d at 779 (citation and quotation omitted) (emphasis added), or "denied" this opportunity, we get to the heart of the problem with his claim and with the majority's constitutional holding. When counsel for Ramirez–Alejandre was asked during oral argument why prior to the Board's decision he had not tried to augment the evidentiary record by filing a motion to reopen or to remand, his answer was quite revealing:

> (Mr. Kaufman) If he [Ramirez–Alejandre] was required to submit a motion to reopen, or in this case it would be treated as a motion to remand, he would have to give up the win. He'd have to throw in the towel and ask for.... Well, if he's asking to reopen the case, then he's saying that I no longer want to have this win.

When pressed on this point, he struck with this unpersuasive excuse, stating,

> (Mr. Kaufman) There is no clear rule that says that a motion to reopen is the *only vehicle* that an applicant can use to supplement the record when a case is before the BIA.

\*     \*     \*     \*     \*     \*

(Mr. Kaufman) Rule 3.2(c) says that an alien who wishes to introduce new facts *may* file a motion to reopen.

\* \* \* \* \* \*

(Mr. Kaufman) A motion to reopen is one of two ways, a motion to reopen, or just send it in. *We just sent it in. It violates due process to ignore what we sent in.*

\* \* \* \* \* \*

(Mr. Kaufman) Whether the evidence comes to the BIA in a motion to reopen under 3.2, *or if the evidence comes to the BIA appended to an appellate brief, its job is the same. It has to assess the evidence.*

(Emphasis added).

Chief Judge Schroeder asked counsel why he persisted in claiming he had to "throw in the towel" and "give up his win" when he could easily have made his motion in the alternative, i.e., "rule for me on the INS's appeal, or, in the alternative, if you are inclined to rule for the Service, consider my new evidence as a motion to remand so that I can introduce new evidence that will bring a stale factual record up-to-date." Ramirez–Alejandre's answer to our Chief's sensible question was to stick doggedly with his I-can-just-send-it-in-and-they-have-to-consider-it refrain. His briefs and his answers to our questions show without a doubt that he knew how properly to reopen the factual record to preserve his point, but he chose not to do so.

It gets worse. Judge Thomas, the author of the majority's opinion, asked him at oral argument whether his remedy was not "to reopen *after* the BIA rendered its decision?" Ramirez–Alejandre's counsel's answer to this question drives a stake through both the heart of his claim and the majority's conclusion that he was "denied" this opportunity:

(Mr. Kaufman) Petitioner *had the option of asking the Board to reopen* but it was

clear to me that the BIA's decision dictated what they would do with that.

I then asked counsel if I understood him correctly to have made the choice not to exercise his known option to file a motion to reopen, and his answer, delivered with a shrug of his shoulders, was, "I decided to file the petition for review."

What all of this boils down to is a textbook example of a number of knowing and deliberate decisions Ramirez–Alejandre's counsel made *not* to exhaust the adequate remedies that *he confesses* were available to him to augment the record. The record as properly considered thoroughly impeaches the majority's conclusion that Ramirez–Alejandre was "denied the opportunity to request the submission" of legally relevant evidence that had developed in the eight years after his hearing before the immigration judge. Ramirez–Alejandre says he knew he had this very opportunity by following the procedure established by *Coelho* as controlling case law and the Rules, but he decided to forego it, and he did so more than once. Not once did he assert in his briefs that the Rules and practice gave him no avenue to augment the record.

We have been here before, with different results. In *Roque–Carranza v. INS,* 778 F.2d 1373 (9th Cir.1985), we said the following:

> INS regulations set out a mechanism for the reopening or reconsideration of deportation hearings. The petitioner must submit a motion to reopen to the BIA and state the new facts to be proved at the reopened hearing. 8 C.F.R. § 3.8(a) (1985). The BIA is vested with the discretion to determine when a hearing should be reopened … based upon its evaluation of whether the evidence sought to be introduced is material and was previously unavailable. 8 C.F.R. § 3.2 (1985). We have held that

in circumstances such as at bar we will not supersede this ordinary reopening procedure by compelling the BIA to reopen the hearing. Thus, the petitioner must follow the INS regulations and file a motion to reopen or for reconsideration with the BIA.

*Id.* at 1373–74 (internal citations omitted).

Given Ramirez–Alejandre's position as *he* explains it to us, in contrast to how the majority's opinion remodels it, it is clear that the majority has decided a hypothetical case. The majority goes out of its way to try to assert that somehow he could not have made these motions had he tried, but Ramirez–Alejandre's rationale for his choices *not* to make such motions makes the majority's effort utterly irrelevant. The path to full consideration of his evidence was clear, but Ramirez–Alejandre chose not to take it.

Moreover, as mentioned earlier, Ramirez–Alejandre never made the claim to the BIA that their Rules, practices, and procedures were so arbitrary and capricious that they denied him due process by refusing to accept his information. He did not do so before the BIA ruled, and he did not do so in a motion to reopen. Furthermore, he did not make this claim to us, not in his petition for review, and not in any of his briefs. In fact, his position was that he could have made a motion to remand or reopen, but was not required to do so. I quote from his opening brief:

> 8 C.F.R. Section 3.2(e) (1999) permits petitioner to present evidence to the BIA on appeal.... At least some of the evidence petitioner offered the BIA on appeal satisfied the requirements [for reopening the record] of Section 3.2(c) because it was both material and new.

I quote next from his petition requesting rehearing en banc:

> While 8 C.F.R. § 3.2 certainly permits the BIA to consider evidence offered on appeal, the panel erred in finding that

petitioner was *required* to invoke it's [sic] provisions in a formal motion in order to compel the BIA to consider all of his evidence, or to vest this Court with jurisdiction to review the BIA's decision when it refused.

First, petitioner did not have to "reopen" his proceeding under 8 C.F.R. § 3.2 to compel the BIA to consider his evidence. When the evidence was offered petitioner was the prevailing party in the proceeding. The IJ had *approved* his application for suspension of deportation. The appeal to the BIA was made by the INS, not petitioner. For petitioner then, the proceedings were already "open".

Ramirez–Alejandre has conceded that he had a right to move to reopen the record. Why the majority feels empowered when Ramirez–Alejandre concedes he had the right to reopen to tell him he did not is peculiar indeed. The Rules were in place when Ramirez–Alejandre made his choices, *Coelho* had been published, and controlling case law was clear, Ramirez–Alejandre knew what he could do, he was on notice that the INS had objected, but he did not want to "throw in the towel and give up his win." If he now regards his situation as a predicament, it was entirely self-inflicted. Parenthetically, Ramirez–Alejandre does not dispute that the 1999 Amendment to 8 C.F.R. § 3.2 simply codified the standard practice of which he was fully aware.

Ramirez–Alejandre's counsel's only justification for his conduct is his incorrect interpretation of an inapposite case decided after his final submission to the BIA, *Larita–Martinez v. INS*, 220 F.3d 1092 (9th Cir.2000). He argues that *Larita–Martinez* "holds that the due process requirement of a 'full and fair hearing' *'mandates'* that the BIA consider *'all'* relevant evidence submitted on appeal." This "just

send it in and the *BIA* must consider it" position is both a skewed view of *Larita–Martinez's* holding and a novel concept of what is evidence. In that case, unlike this one, the BIA made no mention on its decision of information submitted on appeal by the, petitioner. Thus, the three-judge panel invoked the presumption that all evidence is considered unless the tribunal says otherwise, and the panel simply did not reach that petitioner's due process issue. The panel's opinion cannot be read for the position argued by Ramirez–Alejandre, and it did nothing to sweep away the BIA's regulations governing the reopening of the factual record. To the extent that *Larita–Martinez* can be misread to support Ramirez–Alejandre's argument, we should take this opportunity to set the record straight. We are left with a situation where the record is whatever counsel happens to include in letters to the Board. One can only wonder if we have destroyed the concept of an evidentiary administrative record in BIA cases.

The majority seems also to be mistaken as to what the BIA means when it refers to "reviewing facts *de novo*." This description does not mean that the BIA routinely creates a new factual record and entertains new and untested factual information in connection with its decision. All de novo means in that context is that the BIA re-weighs and re-evaluates historical facts already in the record in order to arrive at its own factual findings, giving no deference to the IJ's interpretation of them. Evaluation de novo is and was not an open invitation willy-nilly to submit *new* untested facts not in the record made by the IJ.

We come next to the majority's assertion that *"on occasion"* the BIA has accepted and considered new evidence on appeal. This "on occasion" assertion is true, but it tells only part of the story of this exceptional practice, and in so doing, it

distorts by omission what the BIA "on occasion" has done, and why. Here, using the meager handful of cases cited by the majority, is the whole story.

In *Matter of Ss. Captain Demosthenes,* 13 I. & N. Dec. 345, 1969 WL 16979 (B.I.A. 1969), the official immigration status of an alien crewman of a ship, whose inappropriate behavior had resulted in monetary fines against his vessel, had changed between the time the district director made his decision to fine his vessel and the BIA's consideration of the ship's appeal. To quote the BIA regarding this change,

> At the time the district director considered the case, [the crewman Koumoutsos] was still at large in this country. However, information has now been received by this Board that he was eventually apprehended by immigration authorities in Boston, Massachusetts, and deported to Greece at the expense of the vessel's owners.

*Id.* at 346.

Attached to this recitation regarding Koumoutsos's fate at the hands of the INS, we find this qualifying footnote:

> Ordinarily, we would remand the case to have this information introduced into evidence and considered by the District Director, but we will not do so here because of the unavoidable administrative delay involved; because the authenticity of the information does not appear to be subject to question; and because the present posture of the case calls for final resolution of all aspects of the problems presented, at one and the same time.

*Id.* at 346 n. 1.

Next, we come to *Matter of Godfrey,* 13 I. & N. Dec. 790, 1971 WL 24426 (B.I.A. 1971), a case involving a deportation order against an alien who entered into a sham marriage. In this case, new counsel asked

the BIA on appeal to allow oral testimony explaining his client's earlier written inculpatory statement received at the hearing from which the appeal was being taken. The BIA rejected this unusual request with this explanation:

> We did not permit her to testify at oral argument for two reasons. First, this Board is not equipped to receive oral testimony. Second, we ordinarily confine our review to a consideration of the record alone, *although in exceptional cases* we do receive and consider additional affidavits or other documents not previously available.

*Id.* at 791 (emphasis added). This statement, too, is the subject of a footnote in the BIA's opinion, a footnote that cites authority for the "exceptional circumstances" exception. That authority is *Matter of Ss. Captain Demosthenes.*

As for *Hazzard v. INS*, 951 F.2d 435, 440 (1st Cir.1991), that court's authority in that case for the proposition that the BIA "may consider" new evidence not presented to the IJ is *Matter of Ss. Captain Demosthenes* and *Matter of Godfrey*. All *Hazzard* does is confirm what I have already exposed as the holdings and reasoning of those "exceptional circumstances" cases. The other circuit court case the majority cites is *Charlesworth v. INS*, 966 F.2d 1323 (9th Cir.1992). *Charlesworth* involves our approval of a BIA decision *to reopen* a case pursuant to 8 C.F.R. § 3.2. If anything, *Charlesworth* hurts Ramirez–Alejandre's argument.

We find the same exceptional circumstances principles at work in *Matter of Flores–Gonzalez*, 11 I. & N. Dec. 485, 1966 WL 14281 (B.I.A.1966). Here, the BIA concluded that an error of law adverse to *Flores–Gonzalez* had been made during a deportation hearing in connection with his application for suspension of deportation. Given this conclusion, the BIA remanded the case "to the special inquiry officer for a reappraisal and reevaluation of the evidence concerned with the respondent's application for suspension of deportation and a decision as to whether suspension of deportation is warranted as a matter of discretion." *Id.* at 488. One cannot miss the remedy: remand for consideration of the evidence in the light of the proper law.

*In re Min Song*, 23 I. & N. Dec. 173, 2001 WL 1030900 (B.I.A.2001), is consistent with the BIA's view that it has discretion in extraordinary cases to consider new evidence. The issue involved a removal order based on the alien's conviction of an aggravated felony. In the interim, by an act of the state court in which Min Song had been convicted, the felony had lost its aggravated nature. The BIA's decision speaks for itself.

> In his brief on appeal, he presents new evidence relating to the reduction of his criminal sentence and requests termination of these proceedings, asserting that the theft offense of which he was convicted no longer falls within the definition of an aggravated felony. In support of his request to terminate, he has submitted a copy of an order dated April 4, 1999, issued by the Circuit Court for Montgomery County, Maryland, which vacated nunc pro tunc the district court's February 2, 1992, sentence in the criminal case and ordered the sentence revised nunc pro tunc to 360 days, which was suspended. The Immigration and Naturalization Service has not indicated any objection to this evidence of the revision of the respondent's sentence.

*Id.*

*In re Xiu Hong Li*, 21 I. & N. Dec. 13, 1995 WL 239563 (B.I.A.1995), is yet another illustration of the BIA's consistent exercise of discretion in exceptional cases. After clarifying a relevant principle controlling its ultimate decision, the BIA referenced new evidence in connection with

its decision *to remand* for further consideration of the petitioner's application for a visa. The BIA said,

> Ordinarily, we would not consider evidence first offered on appeal. See *Matter of Soriano*, 19 I & N Dec. 764, 1988 WL 235429 (BIA 1988); *Matter of Obaigbena*, 19 I & N Dec. 533, 1988 WL 235440 (BIA 1988). However, in this instance the issue to which this evidence pertains was understandably not focused on below, inasmuch as no standard had yet been articulated regarding the treatment of terminations of adoption for immigration purposes. In light of our decision, accordingly, we find it appropriate to remand this matter to the RSC director to allow the petitioner a full and fair opportunity to meet his burden of establishing that the natural parental relationship has been reestablished under Chinese law such that it can be recognized for immigration purposes.
>
> Accordingly, this matter will be remanded to the RSC director for further consideration of the visa petition.

*Id.* at 18–19.

In summary, what we see is a rare practice engaged in "on occasion" by the BIA under clearly extraordinary circumstances involving uncontested and incontestable information. What the majority has done with the BIA's rational practice is to turn it into a practice that must be available to every appellant such as Ramirez–Alejandre, whether exceptional circumstances are present or not. The majority has converted the BIA's discretionary use of that rare practice into a constitutional right. This is not only unprecedented, but it is wrong.

Moreover, I fail to see how we can construe Ramirez–Alejandre's statement on November 3, 1994, that he would "not oppose" a motion by the Service to remand as a motion by him to remand. It wasn't. But then to conclude that the BIA's failure to so construe *the government's* remand motion set the stage for a due process claim violation is to build the top floor of a house of cards on a missing layer.

When all is said and done, however, and speaking of TEGWAR, where have we left the BIA? In the body of the majority's opinion, the holding is that the BIA had a constitutional duty to "consider" Ramirez–Alejandre's "tendered evidence information." What does "consider" mean? What does this do to the record? Will it be consistent with the majority's opinion for the BIA to say, "We have construed Ramirez–Alejandre's numerous references to new evidence as a motion to reopen the record, and we have denied that motion because even accepting his information as true, it is not sufficient to establish 'extreme hardship.' "? Or would this consideration fall short of what the majority demands?

The irony in our resolution of this case, of course, is that had the BIA construed Ramirez–Alejandre's submissions as a motion to remand or to reopen and then denied it, we would be without jurisdiction to entertain this issue. Why? Because our standard of review with respect to motions to reopen is for abuse of discretion, *see Israel v. INS*, 785 F.2d 738, 740 (9th Cir. 1986), and in transitional Rules cases, "abuse of discretion claims recast as due process violations do not constitute colorable due process claims over which we may exercise jurisdiction in deportation suspension cases ...." *Sanchez–Cruz*, 255 F.3d at 779 (citation omitted). *See also INS v. Doherty*, 502 U.S. 314, 323, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992) (alteration in original) (quoting *INS v. Abudu*, 485 U.S. 94, 99 n. 3, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)) ("We also noted in *Abudu* that the abuse-of-discretion standard applies to mo-

tions to reopen 'regardless of the underlying basis of the alien's request [for relief].' ").

## II

The latest example from the Supreme Court of our excessive zeal on behalf of petitioners is *Ventura v. INS*, 264 F.3d 1150 (9th Cir.2001). The Court summarily reversed us in a unanimous per curiam opinion, concluding that we "exceeded [our] authority" when we made a decision that properly belonged to the BIA. *INS v. Ventura*, —— U.S. ——, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002). *See also Chen v. INS*, 266 F.3d 1094 (9th Cir.2001), *judgment vacated by INS v. Chen*, —— U.S. ——, 123 S.Ct. 549, 154 L.Ed.2d 423 (2002). I fear we have made a similar mistake here. To resurrect the words of Judge Kozinski in *Abovian v. INS*, 257 F.3d 971 (9th Cir. 2001) (Kozinski, J., dissenting from denial of rehearing en banc, representing the views of eight concurring judges), the Ninth Circuit "overthrows ... perfectly reasonable BIA decision[s]" in asylum and withholding of removal cases "by invoking novel rules divorced from administrative law, Supreme Court precedent and common sense[,]" and thus has "whittled away the authority and discretion of immigration judges and the BIA." Judge Graber made a similar observation in *Cardenas v. INS*, 294 F.3d 1062, 1069 (9th Cir.2002) (Graber, J., dissenting): "[T]he majority resolves every ambiguity in favor of [the asylum applicant], whereas [the correct] standard of review requires us to resolve every ambiguity in favor of the decision-maker below."

It is common knowledge that when Congress placed new limitations in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") on our authority to review certain BIA decisions, Congress did so in response to documented, unwarranted sorties by the judiciary onto the BIA's administrative turf. The

impact of IIRIRA on our role in this process was draconian. To quote *Kalaw v. INS*,

> IIRIRA dramatically altered this court's jurisdiction to review final deportation and exclusion orders. It introduced sweeping changes into our immigration laws, including the specific repeal of the judicial review procedures previously provided under INA § 106. IIRIRA's replacement section for judicial review, new INA § 242, purports to vest the BIA with final appellate jurisdiction for most INS deportation proceedings. *See* IIRIRA § 306 (now codified at 8 U.S.C. § 1252).

133 F.3d 1147, 1149 (9th Cir.1997).

Ramirez–Alejandre's petition for review demonstrates the impact of these new restrictions imposed by Congress on our authority. As the majority demonstrates, we no longer have jurisdiction to review the "discretionary determination whether an alien seeking suspension of deportation ... has met the statutory eligibility requirement of 'extreme hardship.' " *Sanchez–Cruz*, 255 F.3d at 778 (citing *Kalaw*, 133 F.3d at 1152); *see also* IIRIRA § 309(c)(4)(E) (1996). In addition, we have no longer any power to review the Attorney General's discretionary decision to grant suspension once eligibility is determined. So what have we done here? With all respect to the majority, we have indulged in an end-run around IIRIRA and improperly inserted ourselves once again into the administrative prerogative of the BIA, where we do not belong. In so doing, we have decimated the concept of a record of evidence reviewable and controlling on appeal and ordered the BIA to consider whatever counsel sends in.

## III

Congress has authorized the Executive Branch in the person of the Attorney Gen-

eral to establish "requirements and procedures" governing asylum applications. 8 U.S.C. § 1158(b)(1); *see also* 8 U.S.C. §§ 1158(b)(2)(C), (d)(1), (d)(5)(B). Moreover, Congress has charged the Attorney General, not us, with the primary responsibility for administering the immigration laws. *See* 8 U.S.C. § 1103(a), as amended by Public Law 107–296 § 1102 (2002). Our assigned limited role is to *review* the workings of the BIA, not to run the INS. When we exceed our authority, separation and allocation of powers in a constitutional sense are clearly implicated. "In this government of separated powers, it is not for the judiciary to usurp Congress' grant of authority to the Attorney General by applying what approximates *de novo* appellate review." *INS v. Rios–Pineda,* 471 U.S. 444, 452, 105 S.Ct. 2098, 85 L.Ed.2d 452 (1985). This excursion beyond our warrant is particularly troubling here because of the connection between immigration law, foreign affairs, and national defense. Nevertheless, once again we aspire to be all things to all people. Over the years, we have established a body of law in this Circuit that is at odds with what Congress has asked us to do.

As one final example of our repeated errors, we have the Supreme Court's opinion in *INS v. Wang,* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981), summarily reversing our en banc opinion. In that case, we had overruled the BIA's decision not to reopen a request for suspension of deportation based on extreme hardship. In reversing our holding, the Court said,

> By requiring a hearing on such a motion, the Court of Appeals circumvented [the regulation], which was obviously designed to permit the Board to select for hearing only those motions *reliably indicating* the specific recent events that would render deportation a matter of extreme hardship for the alien or his children.

*Id.* at 143, 101 S.Ct. 1027 (emphasis added). The Court then castigated us for extending our " 'writ beyond its proper scope.' " *Id.* at 145, 101 S.Ct. 1027 (quoting Sneed, J., dissenting from our en banc opinion).

I regret the majority's inappropriate and unnecessary decision to liken the BIA to a fictional comedy. Our warrant to entertain petitions for review does not contemplate this kind of critical judgment. Moreover, the majority does so on the basis of a handful of unusual cases out of tens of thousands of cases decided by that agency. It is time to accept the limits of our role. The due process violation shoe does not fit Ramirez–Alejandre's foot, but nonetheless, we allow him to use it to kick open the door that he chose not to open with the handle he knew was there and which the INS explicitly brought to his attention. When all is said and done, he has prevailed. If counsel just sends it in to the BIA, the Constitution requires that appellate body to consider it on the merits.

I respectfully dissent.